LEHIGH VALLEY R. CO. v. DUPONT.

(Circuit Court of Appeals, Second Circuit. February 25, 1904.)

No. 129.

1. RAILROADS—INJURIES TO PASSENGERS—PLATFORMS—IN SAFE PLACES—QUESTION FOR JURY.

In an action for the wrongful killing of a passenger as he had just reached a narrow platform provided for passengers to board trains, the cars of which overlapped the platform between 13 and 14 inches, by reason of its being constructed on a curve close to the rail, evidence held to justify the court in submitting to the jury the question whether defendant was guilty of negligence in providing an unsafe platform.

2. SAME.

In an action for the killing of a passenger while he was standing on a platform, the railroad company was not negligent merely in running a special train past such platform, shortly before the scheduled time for the arrival of the regular train, which the passenger intended to take, without notice to the station master, nor because such train was permitted to run at an excessively high rate of speed.

3. SAME—CONTRIBUTORY NEGLIGENCE.

Where a railroad company maintained a narrow passenger platform at a curve, where trains approaching could be seen only for a short distance,

and the station master, on hearing a train approach, informed deceased, who had a ticket for transportation on the expected train, to go to the platform, under the mistaken belief that such train was the regular train, instead of a special, which passed the platform at a very high rate of speed, and killed deceased just as he reached the platform, by reason of the fact that the train overhung the same some 13 or 14 inches, deceased was not guilty of contributory negligence as a matter of law.

4. SAME—INSTRUCTIONS.

In an action for the death of a passenger as he reached a station platform, by reason of the overhanging of a train which passed the platform at a high rate of speed, an instruction that if deceased did anything that a man of prudence under the circumstances would not have done, or omitted to do anything that a man of prudence would have done, and that deceased had a right to assume that the platform was so related to the track that the train would not sweep over any portion of it, which the court modified on defendant's objection so as to charge that deceased had a right to assume generally that the train would not sweep him off, and that it was his duty to use the platform with ordinary care and prudence, was not erroneous.

5. SAME—CONNECTING CARRIERS—THROUGH CONTRACTS—PARTNERSHIP.

Where the lines of several railroad corporations are conducted as a single system, for the purpose of the traffic between different points, originating on either, and such corporations divided the proceeds of such business on a mileage basis, the several corporations as to such business were partners, and liable to third persons on the principles of the law of agency.

6. SAME—DOMINANT CARRIER—LIABILITY.

Where defendant sold deceased a ticket for transportation between two points, containing nothing to show that such transportation, or a part thereof, was to be performed on the E. Railroad, operated by another corporation, whose stock was entirely owned by the L. T. Railroad Company, the stock of which in turn was owned by defendant company, which in fact controlled the operation of the E. Railroad Company through defendant's officers, defendant was liable for the wrongful killing of such passenger, though resulting from the negligence of the E. Railroad Company.

In Error to the Circuit Court of the United States for the Eastern District of New York.

Allan McCulloh, for plaintiff in error.

Joseph Fessresch, for defendant.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

WALLACE, Circuit Judge. This is a writ of error by the defendant in the court below to review a judgment for the plaintiff entered upon the verdict of a jury.

The plaintiff brought the action as the administratrix of Jules Dupont, deceased, to recover damages for his death, alleged to have been occasioned by the negligence of the defendant. The defendant is a Pennsylvania corporation which, besides the railroads which it owns, has acquired control of the railroads of several other corporations through its ownership of the capital stock of these corporations, the whole constituting what is known as the Lehigh Valley Railway System, and forming a continuous main line from Jersey City, N. J., through the state of Pennsylvania, to Buffalo, N. Y., with various branch lines. One of the roads thus acquired is the Easton & Amboy

Railroad, which has its western terminus at Phillipsburg. The Delaware river separates Phillipsburg from Easton, which is the eastern terminus of the main line of the defendant, and the railways of the Lehigh Valley System are connected between these two places by the railroad bridge of the defendant. The deceased was killed in July, 1901, at the railway station at Alpha, a village on the line of the Easton & Amboy Railroad a few miles east of Phillipsburg, by a train running upon that road, while he was standing upon a passenger platform adjacent to the track, preparatory to taking a west-bound train. His passage ticket had been purchased the day before at Easton of the defendant's ticket agent, and entitled him to one continuous passage between Easton or Phillipsburg and Alpha, in either direction.

. The principal issues contested upon the trial were (1) whether the death of the decedent was caused by the negligence of the Easton & Amboy Railroad Company; (2) whether he was guilty of contributory negligence; and (3) whether the defendant was liable to the plaintiff for the negligence of the Easton & Amboy Railroad Company.

. The evidence upon the trial bearing upon the issues of negligence and contributory negligence was this: The station at Alpha is located upon a curve of the railroad, which to the eastward runs through a cut. At the time of the accident there was a waiting room and platform at one side of the tracks, where passengers commonly awaited the arrival of trains upon either track, and opposite, and across three tracks, and outside the west-bound track, was an uncovered platform, from which they took the trains upon that track. The platform was about 100 feet long and something less than 6 feet broad, and was occupied in part at the rear by a bench and handrail. At the front it was so near the track that the cars in passing overlapped it 13 or 14 inches. A west-bound approaching train could be seen from this platform a distance of about 1,000 feet. It also appeared that the decedent, with certain members of his family, had been awaiting in the waiting room the arrival of the west-bound train due to leave Alpha at 9:31 a. m. for Easton. Very shortly before their train was due the whistle of an approaching locomotive was heard, apparently rounding the curve in the cut to the eastward of the station, and thereupon the station master notified them: "This is your train; all aboard; hurry across." The approaching train was not in fact the train they had been waiting to take, but was a special train sent out by the defendant for the accommodation of its president, consisting of the president's car, another car, and a locomotive. The party hurriedly crossed the tracks, and reached the platform, and a moment after the decedent was killed by the special train, which passed without stopping, and at a speed of between 50 and 60 miles an hour. He was seen to throw up his hand as if to hold his hat on his head, and the next moment he was under the train and cut to pieces, but none of the witnesses saw what occurred during the interval. These facts were practically undisputed. A brief description of the accident was given by one of the witnesses for the plaintiff in the following testimony:

"We sat there in the station, and the station agent told us after a while that the train was coming, and we started from the station across the track, and we found that the train did not slow up any, and the station master told

us to 'hurry up,' and I heard my brother-in-law [the deceased] call to my aunt who was with us to hurry across, and I looked at him and he was just stepping on the platform at that time, and the shriek of the engine as it was nearing the platform then distracted my attention, and 1 looked towards the train, and that was the last I saw of him until I saw the body going around the wheels."

The deceased had lived at Alpha about a year, and had frequently traveled by train between Alpha and Easton.

The evidence upon the trial upon the question whether the plaintiff's right of recovery was against the defendant or only against the Easton & Amboy Railroad Company established the following facts: The Easton & Amboy Railroad has been operated and managed by the officers and agents of the Easton & Amboy Railroad Company since 1893, at which time a lease which had been made by that corporation to the defendant in 1892 was declared illegal in a suit brought by the Attorney General in behalf of the state of New Jersey. By the decree in that suit it was ordered that the Easton & Amboy Railroad Company should resume possession of its railroad, property, privileges, and franchises, and operate them by its own officers and agents. Since 1893 the entire stock of the corporation has been owned by the Lehigh Valley Terminal Railroad Company, another New Jersey corporation, and the entire stock of this latter corporation has been owned by the defendant; and the directors of the Lehigh Valley Terminal Company have been elected by the vote of the defendant, and the officers and directors of the Easton & Amboy Railroad Company have been elected by the vote of the Lehigh Valley Terminal Company. The freight and passenger business between the two corporations has been done upon a mileage basis, the charges being prorated, and each one receiving its proportion. Considerable evidence was introduced by the plaintiff upon the trial for the purpose of showing that for a long time previous to the accident the defendant had held itself out to the traveling public as the apparent carrier operating the Easton & Amboy Railroad. It appeared that the same person was the superintendent of the defendant and of the Easton & Amboy Railroad Company; that the same person was the general passenger agent of each; that in the advertisements and timetables of the defendant the Easton & Amboy railroad had always been treated as a part of the railroad of the defendant; and that the cars, conductors, and employés upon that railroad have been apparently those of the defendant, the cars being lettered in its name, and the conductors and employés wearing its initials upon their uniforms.

The assignments of error which challenge the rulings of the trial judge upon the questions of negligence and contributory negligence are addressed to his refusal to direct a verdict for the defendant and to his instructions to the jury.

It is unnecessary to consider these assignments in detail. The decedent had put himself in the care of the Easton & Amboy Railroad Company for the purpose of taking passage upon its train then about due to arrive, having a ticket which entitled him to carriage by that train. The relation of carrier and passenger existed at the time he crossed the track and reached the platform. If the carrier had not

used due care to provide him with a safe place to await and board the train, negligence was established. Neither the Easton & Amboy Railroad Company nor the defendant was chargeable with negligence merely because of the running of a special train through Alpha shortly before the schedule time for the arrival of the regular train without notice to the station tender, nor merely because the train was permitted to run at an excessively high rate of speed. The trial judge so instructed the jury, and he left it to them to decide whether, in view of its relation to approaching trains, the platform as it was constructed was an unsafe place.

We think the facts fully justified that instruction. The probability that unexpected trains, running at high speed, might pass it while passengers were properly there, exciting and confusing them, as such an occurrence naturally would, was one which should have been considered by the carrier in determining the locality and dimensions of the platform. So, also, the probability that at times it would be used by the young, or the infirm, or by passengers otherwise incapacitated to exercise the utmost intelligence for their own safety, should have been considered. So, also, its location at a point where a fast train could not be seen approaching for a period of more than about a dozen seconds should have been considered. These considerations would seem to have been neglected when the platform was made as narrow as it was, and located so near the track that passing cars overlapped it as they did. The margin of safety was sufficient under ordinary conditions for passengers aware of its relation to the track, and exercising due prudence, but not sufficient under conditions which were likely to occur when it was being legitimately used. In Dobiecki v. Sharp, 88 N. Y. 203, where the cars projected over the platform only from three to five inches, the court were of the opinion that the question of negligence was one for the jury. In Archer v. The New York, etc., R. R. Co., 106 N. Y. 589, 13 N. E. 318, where the cars overlapped the platform only two or three inches, the court considered that the jury were authorized to find negligence. It is not necessary to adopt either of these decisions for the purposes of this case, but they illustrate the trend of judicial opinion in respect to the danger of constructing a platform so that at any part of it a passenger is likely to be struck by passing trains. Nor is it necessary to adopt the view of the trial judge that the only element of negligence for the consideration of the jury was the failure of the carrier to provide a safe place. It suffices that the instructions were as favorable for the defendant as it was entitled to ask. Upon the issue of contributory negligence the facts justified the refusal of the trial judge to direct a verdict for the defendant. The evidence authorized the jury to find that the decedent was killed almost immediately after he had reached the platform; that in the intervening moment his attention was distracted and his deliberative faculties practically paralyzed by the onrush of a flying train and shrieking locomotive in place of an expected train, which would be moving slowly preparatory to stopping at the platform; and that during a second or two of this brief and disconcerting interval he unconsciously exposed himself near the perilous edge of the platform and beyond the undefined safety line.

The trial judge instructed the jury, in substance, that the plaintiff was not entitled to recover if the decedent did anything that a man of prudence, under the conditions and circumstances then existing, would not have done, or omitted to do anything that a man of prudence would have done, and that they were to consider whether he was guilty of any negligence in not going back to the railing at the rear of the platform, and what opportunity he had to reach it, and whether he knew, or had reason to know, that if he stood near the edge of the platform the overhang of passing cars would sweep him off. The only criticism that can be fairly suggested of his instructions is based upon that one in which he stated that the decedent "had a right to assume that the platform was so related to the track that the train would not sweep over any portion of it." Upon an exception by the defendant to that instruction, he qualified it by stating that the decedent "had a right to assume, generally, that the train would not sweep him off, but it was his duty to use the platform with ordinary care and prudence." If the decedent had been unaware previously that the passing trains overlapped the platform, this instruction would have been strictly correct. It should be considered in connection with the instructions which had preceded it, and which directed the attention of the jury to the inquiry whether the decedent knew, or had reason to know, that passing cars would overhang the platform near the edge. The instructions, in their entirety, left the jury under no misapprehension as to the obligation of due care on the part of the decedent.

The remaining assignments of error challenge the rulings of the trial judge upon the question whether the defendant, in any view of the facts, was the carrier against whom the action could be maintained.

The title to the franchises, privileges, and property of the Easton & Amboy Railroad Company was vested in that corporation, and the railroad upon which the deceased was killed was operated and maintained financially and physically by that corporation; but the potential and ultimate control of all its property and business affairs was lodged in the defendant, and this control was exercised as completely and as directly as the machinery of corporate organisms would permit. Inasmuch as, under the laws of New Jersey, the Easton & Amboy Railroad Company was incapable of transferring to the defendant its franchises, privileges, and property, and the defendant could not acquire them, the defendant was not in legal contemplation the owner nor operating the Easton & Amboy Railroad. But the law does not prevent one railroad corporation from making a contract with a passenger to carry him beyond its own road and upon or over the connecting roads of another railroad corporation and assume towards him all the ordinary obligations of a passenger carrier during the transit. The contract, being incidental to one to carry him over its own road, is not ultra vires. Nor is it ultra vires for a railroad corporation to agree with other railroad corporations upon such terms of co-operation in transacting their joint business as may be satisfactory. And where the lines of several railroad corporations are conducted as a single system for the purposes of the traffic between different points originating upon either, the corporations may constitute themselves a partnership for the business of such traffic; and when they do, al-

though the general management of each road is retained by the corporation owning it, the several corporations are, as to such business, partners, and liable upon the principles of the law of agency. When a relation of joint and several agency exists in a system of dominant and subordinate carriers, the dominant carrier is liable for all breaches of obligation by any of the other constituent carriers in the performance of a contract made by it for the transportation of passengers or freight. These propositions are established by the following authorities: Swift v. Pacific Mail Steamship Co., 106 N. Y. 206, 12 N. E. 583; Philadelphia, etc., R. Co. v. State, 58 Md. 372; Wyman v. Chicago, etc., R. Co., 4 Mo. App. 578; Bradford v. So. Car. R. Co., 7 Rich. Law, 201, 62 Am. Dec. 411; Harris v. Cheshire R. Co. (R. I.) 16 Atl. 512; Block v. Fitchburg R. Co., 139 Mass. 308, 1 N. E. 348; Independence Mills Co. v. Burlington, etc., R. Co., 72 Iowa, 535, 34 N. W. 320, 2 Am. St. Rep. 258; Cincinnati R. Co. v. Spratt, 2 Duv. (Ky.) 4; Barter v. Wheeler, 49 N. H. 9, 6 Am. Rep. 434. We find nothing inconsistent with these propositions decided in Pennsylvania R. Co. v. Jones, 155 U. S. 333, 15 Sup. Ct. 136, 39 L. Ed. 176. Especially should the dominant corporation be regarded as the principal and the constituent corporations as agents when, as in this case, the dominant corporation ultimately derives all the profits and incurs all the losses arising from the traffic originating on any of the lines. We conclude that the relations of the defendant with the Easton & Amboy Railroad Company in respect to the traffic originating on the lines of either were those of a principal and its agent. The ticket which it sold to the decedent evidenced a contract for through carriage between Easton and Alpha in either direction, and on its face did not purport to be the contract of the Easton & Amboy Railroad Company, or refer to that corporation in any way. In view of the relations between the two carriers, it should be regarded as a contract for through transportation, which, so far as it was to be performed on the Easton & Amboy Railroad, was to be performed by an agent of the defendant. Upon the undisputed evidence the trial judge would have been justified in instructing the jury to find a verdict for the plaintiff if they found in her favor upon the issues of negligence and concurring negligence. Consequently the defendant was not prejudiced by his rulings in receiving evidence offered for the purpose of showing that the defendant had held itself out to the public as operating the Easton & Amboy Railroad, or in submitting the case to the jury upon the theory that the plaintiff was not entitled to a verdict unless they should find that the defendant had so held itself out to the public. The complaint set out the facts constituting the cause of action, and was framed upon the legal theory that the defendant was responsible for its own negligence and for that of the Easton & Amboy Railroad Company, and the amendment permitted by the trial judge was unnecessary and did not prejudice the defendant.

The judgment is affirmed.

LACOMBE, Circuit Judge. I concur in the result and in the opinion generally. I do not, however, assent to the proposition that the decedent "had a right to assume that the platform was so related to the track that

the train would not sweep over any portion of it." It does not seem to me that it can be held to be negligence on the part of a railroad company to place its platform so close to the track that some of its cars will overlap its edge. Such a construction is a reasonable one, because it brings the platform and track so near together that there is no open space left between them when cars of other types, with shallower steps and less overhang, are passing. Certainly it must be patent to any one of intelligence enough to be left loose on a railway platform that the strip of platform nearest the track, while very necessary for a person getting on or off the train, is not intended for people to stand on when a train is passing; the suction alone would make it a dangerous place, even if no car or car step overlapped. Of course, the platform may be so narrow that it should be sent to the jury to say whether the defendant was negligent in not providing a sufficiently safe place to wait on, and such is the case here. But if the charge above quoted had been left unqualified, the judgment should be reversed. It seems to me, however, that the qualification which followed objection to it, in connection with the rest of the charge, sufficiently corrected the error; for, in substance, it told the jury that plaintiff had a right to assume generally that the train would not sweep off any one who used the platform with ordinary care and prudence; and this, independent of the circumstance whether he knew the condition of the platform or not. Such knowledge might have an important bearing on the question of plaintiff's contributing negligence, but none at all on the question of defendant's negligence.

It seems to me as if the opinion of the majority might be taken as not repudiating the proposition that the jury might find defendant negligent solely because its passing cars overlapped the edge of the platform, and I wish to record a strenuous protest against any such proposition.