## THE WILLEM VAN DRIEL, SR.

### THE WELBECK HALL.

#### (District Court, D. Maryland. April 20, 1917.)

1. NEGLIGENCE ⊝21—OPERATION OF GRAIN ELEVATOR—NECESSARY PRECAUTIONS AGAINST FIRE.

Respondent operated on a pier, a large grain elevator, 240 feet long, about 100 feet wide, and 180 feet high. In it were 6 so-called receiving legs extending from the track floor to the top, in each of which ran a wide conveyor belt with buckets for carrying up grain passing over a large pulley at the top. While a steamship was loading on either side, the elevator took fire, and there was an explosion causing the death of a number of persons and serious damage to the vessels and cargoes before they could be removed. One of the conveyor belts had become choked and stopped, and some five minutes later dropped the pulley at the top, continuing in the meantime to revolve. The only place where the choking could be observed was on the track floor, while the only means for throwing the belt out of gear was a lever on the machinery floor 152 feet above. There was a considerable delay before this lever could be reached, and it was then found that it was out of repair and would not work. The machinery was stopped, but in the meantime the belt had fallen. There were

originally ropes extending down to the track floor by which the levers could be operated, but they had been for some years out of use and some had been removed. *Held*, that the damage to the ships and cargoes was the proximate result of the burning of the elevator, and on the evidence that the fire was caused by the friction between the belt and pulley, that it was due to the palpable negligence of the elevator company in failing to provide means to obviate a danger so obvious, and that it was liable therefor.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 28–30.]

2. NEGLIGENCE ☞21—FIRES—"ACCIDENTAL" FIRE.
   A fire caused by the negligence of a defendant or his servants is not "accidental" in such sense as to exonerate him from liability for injuries caused thereby to others.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 28–30.

For other definitions, see Words and Phrases, First and Second Series, Accident—Accidental.]

3. NEGLIGENCE ☞54—FIRES—PERSONS LIABLE—STOCK OWNERSHIP OR OTHER CORPORATIONS.
   A railroad company which owned a grain elevator leased it for operation to an elevator company of which it owned all the stock. It afterward leased its road and all of its other property to the Pennsylvania Railroad Company for 999 years, reserving as net rental sufficient to pay dividends on its stock. The elevator company kept up its organization, operated the elevator under its own superintendent, and had a considerable surplus of assets, although it was governed in a general way by the Pennsylvania Company, which also selected and paid its officers. Through its negligence in operating the elevator, causing a fire which destroyed the elevator, libelants' vessels and cargoes were damaged. *Held*, that it was a separate entity, and its management of the elevator was independent to such extent that the Pennsylvania Company was not liable for its negligence causing the loss.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 66, 67.]

In Admiralty. Suits by Namlooze Vennoot Schap, master of the steamship Willem Van Driel, Sr., and by Edwin Dyason, master of the steamship Welbech Hall, against the Pennsylvania Railroad Company and the Central Elevator Company. Decree for libelants, against the Elevator Company only.

Kirlin, Woolsey & Hickox and Charles R. Hickox, all of New York City, and Ritchie & Janney, Stuart S. Janney, and Frank B. Ober, all of Baltimore, Md., for the Willem Van Driel, Sr.

Barry, Wainwright, Thacher & Symmers and James F. Symmers, all of New York City, and Harry N. Abercrombie, of Baltimore, Md., for the Welbeck Hall.

Bernard Carter & Sons and Shirley Carter, all of Baltimore, Md., for Pennsylvania R. Co. and Central Elevator Co.

ROSE, District Judge. [1] On the 13th of last June, two steamships were made fast to the pier upon which there then stood an elevator from which each of them was receiving grain. One of them, the Welbech Hall by name, was on the east side of the wharf; the other, the Willem Van Driel, Sr., on the west. The distance between the pier side of each of these ships and the elevator did not exceed some 8 or 10 feet. By 2 o'clock in the afternoon each had already a large part of its cargo aboard. About that time, with an explosion which

brought down the upper part of the elevator the whole building burst into flames. So far as the evidence discloses, no one on either one of the ships had any warning, prior to the catastrophe, that anything was wrong. Indeed, it was not until within a couple minutes of the explosion that any of the many men in the elevator itself knew that there was fire in it. The outbreak was so sudden and so fierce that a number of persons were killed. From the elevator and the ships every one who escaped fled for his life. It was not until the burning of much of the elevator made its neighborhood less dangerous that it became possible to do anything effectively to get the ships away from the furnace next to which they were lying. Then a number of tugs succeeded in towing to a place of safety the ships already greatly damaged in hull and cargo. The tugs came into this court of admiralty seeking salvage allowance. There is no question that the injury done to the ships and the grain upon them, as well as the danger of further damage from which the exertion of the salvors delivered them, was the direct and proximate result of the fire in the elevator, and that the ships were powerless to protect themselves from such damage and danger.

The elevator and the pier on which it stood belonged to the Northern Central Railway Company, hereinafter referred to as the "Northern Central." Many years before the fire, the latter had leased them to the respondent, the Central Elevator Company, of whose stock it was the owner. The Central Elevator Company for brevity will be styled the "Elevator Company." The Northern Central, some years before the fire, had leased for a term of 999 years all its property to the respondent the Pennsylvania Railroad Company, hereinafter called the "Pennsylvania."

The ships say that the fire was caused by the negligence of the Elevator Company and its employés, and that the Pennsylvania had exercised such control over the management of the elevator that it, as well as the Elevator Company, is liable for the damage done. The flexible methods of the admiralty made it possible to consolidate the salvage proceedings against the ships with the latter's claims against the Elevator Company and the Pennsylvania. By agreement, or by decree, the salvage awards have been made, and in this opinion the salvage operations need not be further referred to.

The elevator which was burned was the fourth which had stood on what was substantially the same site. Every one of them went up in smoke and flames. So far as the testimony discloses, the three predecessors of the one with which this case is concerned were destroyed by fire caused by sparks from locomotives or from donkey engines used on ship board. Nevertheless, their fate emphasizes the inflammable nature of such structures, and the difficulty of saving them from complete destruction when once a fire has gotten under way in them. It also serves, to a degree at least, to bring home to the respondents knowledge of how liable elevators are to destruction by fire. A description of the building burned last June shows why it is that fires in such structures are so disastrous. From north to south it was 240 feet long, and perhaps 100 feet broad from east to west. It had a height of 179 feet 6 inches. For 30 feet from the ground its walls were of

brick, for the remaining 149 feet 6 inches of wooden cribbing covered with corrugated iron. It was full of bins, legs, spouts, and other structures largely of wood. There ran from top to bottom six so-called receiving legs. Each of these legs was an enormously elongated wooden box or flume. For a few feet from the ground each of them was open, and throughout all the rest of its nearly 180 feet it was inclosed. The testimony does not show precisely what was the area of a cross-section of one of these legs or boxes, but it could scarcely have been less than 24 square feet and may have been twice or more than twice this. In each of these receiving legs there ran from the ground, and indeed from a few feet under the ground, nearly to the top of the building, an endless belt some 20 inches wide and from ½ to ⅝ of an inch thick. This belt moved over a pulley which had a width of 28 inches, a diameter of 84 inches, and weighed 1000 pounds. To the outer side of this belt at intervals of from 12 to 16 inches were fixed iron buckets in which the grain was carried up. As one of the witnesses for respondents said, each one of these legs would, on occasion, act as an enormous flue. There were in addition eight shipping legs, the construction of which has not been so minutely described, as well as a number of so-called cleaning legs. Such an elevator when in operation, or when it has recently been in operation, is bound to be very dusty. This particular elevator had for more than a year been running night and day for 20 hours out of every 24, Sundays and a very few holidays alone excepted. It shut down for meals for an hour between 6 and 7 morning and evening, and from 12 to 1 at noon and midnight. A few minutes before the disaster, the millwright had been at work getting ready a new fan to help the sweeping of the floors. It so happened, moreover, that on the day of the fire the press of work on the ground floor had called off the force usually employed in sweeping the upper floors. It may be safely assumed that at the time the fire began the elevator was at least as dusty as usual. The Elevator Company knew how inflammable the elevator was. It took certain precautions against fire. It carefully excluded all strangers from the building. Its employés were forbidden to smoke, or even to have matches on their persons, and, to make sure that the rule was obeyed, they were required, upon entering the building, to change their clothing. The elevator was well supplied with hydrants, hose pipes, water barrels, and buckets. So soon as any one sounded one of the fire alarms in the building, a powerful pump was automatically set to work to furnish a plentiful supply of water for the hose.

It is for lack of reasonable care in another respect that the ships seek to hold the respondents liable. Belts such as those which ran in the receiving legs are, from any one of a number of different causes, liable to become choked. That is to say, the belt in some way is caught and held fast while the pulley upon which it operates continues to revolve. The result is friction which, if continued for any length of time, must necessarily break the belt and may cause fire. The ships say that the particular conflagration which proved so serious originated in this very way, and was the natural and proximate result of a long-continued neglect of the respondents to provide means for promptly and certainly throwing a choked belt out of gear. It had been long recognized that,

in order to reduce the danger from fire to a minimum, there should be means for so doing. In some of the modern elevators, which are operated by electricity, a simple and apparently complete solution of the problem has been found. In them each belt is run by a separate electric motor, which stops whenever the pull upon it becomes unduly great. The respondents' elevator was built in 1903. They cannot be held negligent because they did not then install a system which, if not unknown, was not as yet in general use, nor for continuing to employ the method then adopted. The elevator was operated by steam power. In it all the pulleys were connected with a single line of shafting. It was, of course, often desirable and indeed necessary to throw one leg out of commission without shutting down the others. A friction clutch operated by a lever was provided for each belt, to throw it in and out of gear, as the case might be. This lever was on the machinery floor, which was 152 feet above the ground or track floor. Only from the latter could the choking of a belt be promptly discovered. Everywhere else it was shut up in its wooden box. When some one on the track floor saw that a belt was choked, how could he make sure that the lever nearly 150 feet above his head would be at once used to throw it out of gear? For many years before 1903, the approved practice in elevators equipped as this was to attach to each lever cables which ran down to the track floor. The choking of a belt would be first noticed by some one close to it. The rope or cable came down alongside the leg. No time would be lost in moving from one part of the spacious floor to another. If the friction clutch and its lever were kept in order, the belt could be thrown out of gear in a few seconds after any one knew it was choked. The elevator in question was originally equipped with such ropes, but for a decade or more before the fire they had not been used, at least for the purpose for which they were intended. Some, perhaps most, of them, were still in place; but in what order or condition apparently no one knew, and no one cared. Parts of them had been removed when rope was needed for some other purpose. Their use as means of operating the lever from the track floor had been abandoned, because not long after the elevator was built an oiler who happened to be near a lever when it was pulled from downstairs received a bad blow on the head. The suggestion that it was not well to rely upon the ropes, because the user of them could not see whether the friction clutch did its work, may be put aside. The puller of the rope on the track floor would be in full sight of the belt. He could tell whether it was still under strain from the pulley. If he saw that it was, he coud get word up to the machinery floor, summoning whoever happened to be there to go to the lever and operate it by hand. That was in fact practically the only way in which for years those on the track floor ever tried to get a belt thrown out of gear. Presumably, in the overwhelming majority of instances, a pull on the rope would have sufficed, the time consumed in giving it would not have been appreciable, and no harm would have been done, even in the small minority of cases in which it became necessary to put in use the cumbersome and time-consuming methods which in fact were exclusively employed in this elevator. What those methods were, how

slowly they worked at best, and how great were the chances that everything would not so work, and how many precious minutes were lost when they did not, can be understood from the story of what actually did happen in this elevator between the choking of the belt in leg 3 and the explosion.

The hopper boss on the track floor saw that grain was piling up on the floor over and around the hopper at the base of leg 3. He started to investigate. As he got closer, he thought it looked as if the belt was choked. Apparently appreciating the importance of speed, he broke into a run. When he reached it, he looked up and saw that it was choked. He then did what, under similar circumstances, everybody in that elevator had for many years always done. He went to the speaking tube, which fortunately was nearer to this leg than it was to the majority of them. He sounded the gong on the scale floor, 133 feet above the track floor. The scale floor was the next under the machinery floor, but was 19 feet below it. There were always a number of men somewhere on the scale floor, and it was the duty of the one of them who chanced to be closest to the tube to go to it as soon as the gong told him that somebody downstairs had something to say. On this occasion, one Smith, the boss or foreman of the scale floor, happened to be near the tube. He went to it. He was one of those who lost their lives within less than half an hour thereafter. He was told by the hopper boss that leg 3 was choked. He, in turn, did what it was the rule to do under such circumstances. He sounded the gong on the machinery floor. Now, if there happened to be anybody in this great room, 240 feet long, and he heard the gong, and furthermore supposed that there was nobody nearer than he, he went to it. Apparently, the only person who had any regular business on the machinery floor was the oiler. But he had duties, not only on that floor, but on the one above it and on the one below it as well, and at any particular time he might be on any one of the three, or indeed on none of them. He was, properly enough, forbidden to keep a stock of oil in the elevator. When he needed a fresh supply, he had to go down to the ground, out of the building, to get it. Now, it so happened, that was what he was doing when Smith sounded the gong to call him to the tube. Naturally, there was no answer. How long Smith waited for one does not clearly appear, although one witness estimates it at two minutes; it was probably not longer, as the distinct impression left by the evidence is that everybody understood the importance of haste, and that everybody did what he could to hurry things along, although the methods employed were such that without an unusually favorable combination of circumstances there was bound to be waste of effort and loss of time. After whatever interval of waiting for an answer there was, Smith told one of his assistants, a man named Lucas, to go upstairs and throw belt 3 out of gear. Lucas says he knew nothing of machinery. It is at least doubtful whether he had any clear idea of what he was to do when he got up to the top of the two flights of steps between the scale and the machinery floor. Whether he did or not did not turn out to be material; for, as his head rose above the level of the machinery floor, he saw the millwright, a man

named Aires, coming towards him. The latter was in charge of the machinery in the building and had spent more than 30 years in elevators, serving in five of them, every one of which, by the way, was destroyed by fire. He had been on the machinery floor arranging to install a new fan to assist in the sweeping of the floors. He had not heard the gong, or, if he had, he had not paid enough attention to it to be able to remember it. At the time Lucas hailed him, he was going towards the stairs on some errand having no relation to the belt in question. Lucas says he called out that No. 3 was choked. Aires understood him to say it was No. 2. Aires accordingly went past No. 3 to No. 2, in all a distance of some 56 feet. He listened for a moment and made up his mind that No. 2 was running properly. He went to some convenient hole in the floor and called down to Smith that No. 2 was all right. Smith replied it was No. 3 which was choked, not No. 2. Aires, accompanied by Lucas, then went to No. 3, which was some 18 feet from the stairway, and some 38 feet from No. 2. They moved the lever of the belt, but without effect. The belt was not thrown out of gear. They opened a trapdoor in the leg and smoke came out. In the meanwhile, Young, the hopper boss on the first floor, became worried at the delay and called up to Smith the second time to hurry up. It is possible to fix relatively to some of the other things that happened, the time of this second call, for Smith told Young that Aires was up on the machinery floor and had gone to No. 2 instead of to No. 3. Young does not say anything of having been told as to the mixup between 2 and 3; but from the testimony of Le Brun, who was a sort of assistant to Aires, we know that he was. At this time Le Brun was engaged in laying a floor in the engine room, and Young came and told him that No. 3 was choked and that No. 2 had been thrown out instead of No. 3. It is true that Young says his conversation with Le Brun took place later and after the belt had fallen; but Young was certainly mistaken in this, for Le Brun distinctly testifies that after he had the conversation with Young he went into the elevator, a distance of something like 140 feet from where he was, and looked at No. 3, which was still in place and choked. Indeed, I may say that, where Young's recollection differs from that of the other witnesses in the case, I am persuaded that their version, not his, should be accepted. After Smith had his second conversation with Young, he went up to the machinery floor and there joined Aires and Lucas. All three went up to the floor above the machinery floor, where Smith and Lucas, by Aires' direction, got a piece of scantling and tried to use it as a brake on the large wheel which drove the pulley in leg 3. While Smith and Lucas were so engaged, Aires made up his mind that the friction between belt 3 and the pulley must be stopped, and, as he had failed to throw that belt separately out of gear, the only thing left to be done was to shut down the machinery as a whole. He, accordingly, went down to the machinery floor and walked some 120 feet from the stairway to the north end of the building and to the place at which he could signal to the engineer to stop the engine. This he did. While he was so occupied, Smith seems to have left the upper floor and descended through the machinery floor to his ordinary station on the scale floor.

Just before he reached that point, a third call to hurry and throw out belt 3 came up through the tube from the first floor. The witness White received this message, and, as he did so, saw that Smith was at his side. Smith thereupon called down the tube to have the house shut down. Very shortly after the whistle sounded, showing that the engine room had received Aires' signal and was acting upon it. After the steam had been shut off, 2½ minutes elapsed before the machinery came to a complete stop. It was somewhere during this interval that the belt broke and fell. After Aires gave the signal, he came back to leg 3, and, when he reached it, the pulley seemed to him to be slowing down more rapidly than the rest of the machinery. He at first thought that the efforts of Smith and Lucas to stop the wheel with the scantling had been successful, but when he looked into the leg he saw that the belt had fallen. Smoke was coming out of the leg, but in diminishing quantities. It was quite dark, and he says if there had been any fire in it he could have seen it; but he saw none. With the falling of the belt, all occasion for keeping the house shut down ceased. Aires, accordingly, went again to the north end of the machinery floor and signaled to the engine room to start up. About 4½ minutes must have elapsed between the two signals. The order to turn on the steam was not at once obeyed, as the engineer thought it prudent first to make sure of conditions on the track floor. He, accordingly, went some 140 feet or thereabouts to the center of the elevator to see whether he could safely put the machinery in motion. He was told that he could, and returned to his engine room and did so. The time between the giving of the signal to shut down and the actual starting up again must have been about 6 minutes. Aires probably came down on the elevator as soon as the machinery began to work. He thinks that from the time he left the upper floor until the explosion was not more than 10 minutes. If so, it is probable that the fire was first noticed about 12 or 13 minutes after the belt broke. It is more important to fix the number of minutes from the discovery that the belt was choked to its breaking, but it is also much more difficult. A good deal happened in that interval. Young sounded the gong on the scale floor; Smith came to the tube and received the message; in his turn sounded the gong on the machinery floor, waited vainly for a response; sent Lucas upstairs; Lucas told Aires; Aires misunderstood and went to No. 2, listened, and perceived that there was a mistake somewhere; called down to Smith, who set him straight; went to 3, tried to throw it out of gear, failed, then opened the trapdoor, and looked in. While he was doing all this, Smith had another conversation through the tube with Young, and afterwards came to the machinery floor. Aires, Smith, and Lucas went to the top floor. The latter two with the scantling tried to stop the wheel. Aires went down to the machinery floor and walked 120 feet north on it, sounded the signal to shut down, and some time within the next 2½ minutes the belt broke. Probably everybody moved quickly, but the interval between Young's discovery of the choke and the breaking of the belt could not have been less than 5 minutes, and may have been considerably longer. Had the rope method of operating the lever been in use, and had the machinery been

in order, the belt would have been thrown out of gear in half a minute. Upon this assumption, the dangerous friction was allowed to continue unnecessarily for not less than 4½ minutes. It may be that some of the delay was due to the clutch being out of order; but, if so, the Elevator Company is no better off. It appears that the clutches were never inspected. If when there was some occasion to use them they did not work, the not very difficult conclusion that they were out of order was then drawn.

Was the fire the result of the delay? Respondents say that the evidence does not show that it was.

There are witnesses who, when they first saw or heard of the fire, were on the scale floor, others who were on the track floor, and still others who were outside the main building all together. Of all these, it appears that the first to see any fire was a colored man named Walker. He was on the track floor cleaning up when a live coal fell from leg 3. He stamped it out and reported the fact to Bardroff, the elevator foreman, who was right at hand. The latter made a hurried examination. He saw no fire in No. 3. He called up the tube to the machinery floor to look for fire around No. 3. Lucas was on the scale floor standing near Smith, who received the message. As he did so, somebody called, "Fire!" and Lucas, looking up over his head through the cracks of the floor, saw flames. Just then the fire alarm sounded. White at the time was coming out of the receiving weigher's office on the scale floor. Some one said, "There is a fire upstairs, and I am going to get out." White seized a fire extinguisher and started up to the machinery floor. Lucas on the sounding of the alarm ran to the front of the building. When he saw some one going up the stairs with a fire extinguisher, he turned back; but had made only two steps when the explosion came. By the time White reached the landing at the first of the two flights of steps which lead from the scale to the machinery floor, he saw a reflection of flames all along the main shaft. He realized that a fire extinguisher was useless, and he started down. He had just reached the machinery floor when the explosion took place.

In the meantime, Bardroff down on the track floor went towards leg 2. He smelt smoke, which he thought was stronger in No. 2 than No. 3. Another coal fell. He told Walker to go for a bucket of water. The latter did so, and was coming back to No. 3 to use it when he saw flames and smoke coming out of the grate of No. 1. He threw the water on the grain there, and at that minute the explosion happened. Bardroff in the meanwhile had gotten a bucket of water from another man and had lifted the trap door of No. 2. As he did, a puff of hot air blew out, and then the explosion.

Young was on the track floor at the time. He says he saw Walker going for water, but did not know it was for a fire, and that he heard nothing about the fire until Bardroff sang out, "There's a fire boys, go!" and the explosion instantly followed.

Welker, the engineer, was in the engine room when the fire alarm sounded. He went to the door to see what was the matter, and then

the explosion. He does not think half a minute elapsed between the giving of the alarm and the explosion.

[2] I do not think there can be any reasonable question that the fire was caused by the friction between belt 3 and its pulley. It spread from No. 3 along the shafting and through the legs before it was discovered, either because no one was at the time on the machinery floor or the top floor, or because, if the oiler who lost his life was there, he was in some part of one of those floors remote from the place at which the fire started, or was otherwise so engaged that he did not notice it until it had gained great headway. There is no other known cause for the fire. All the conditions are consistent with its having so originated. Respondents say that, even so, they are not liable. They rely upon the Statute of 6 Anne as amended by that of 14 George III. They did not seek to set fire to the ships. Neither they nor their servants wanted to start a fire at all. They cite the well-known passage in First Blackstone Commentaries, 431, to the effect that any fire is accidental within the meaning of the statute which was not a willful act of the person sought to be held for its consequences. They point to the approval of this construction by Lord Lyndhurst in his remarks upon Lord Canterbury's petition of right (First Phillips' Chancery Reports, 306), and to the fact that it was followed and applied in Lansing v. Stone, 37 Barb. (N. Y.) 15; but both the English and American courts have definitely rejected this interpretation, and upon full consideration have held that a fire caused by the negligence of the defendant or his servants is not accidental within the meaning of these statutes. Filliter v. Phippard, 11 Add. & Ell. N. S. 346; Webb v. Rome, Watertown & Ogdensburg R. Co., 49 N. Y. 420, 10 Am. Rep. 389; Rogers v. Atlantic, Gulf & Pacific Co., 213 N. Y. 254, 107 N. E. 661, L. R. A. 1916A, 787, Ann. Cas. 1916C, 877; Hoffman v. King, 160 N. Y. 622, 55 N. E. 401, 46 L. R. A. 672, 73 Am. St. Rep. 715; Lillibridge v. McCann, 117 Mich. 84, 75 N. W. 288, 41 L. R. A. 381, 72 Am. St. Rep. 553.

Many of the numberless cases in which railroads have been held to answer for the damage done by fire set by sparks negligently allowed to escape from their locomotives may perhaps be put on one side, because in many states special statutes recognize, define, or impose liability under such circumstances.

The respondents reply that if so much be admitted it does not follow that they are liable. They claim that, whatever may be the language of the opinions relied on by the libelants, the fires actually dealt with were in nearly every instance purposely started, although for a proper or at least for an innocent purpose, and the negligence for which the defendants have been held responsible consisted, either in recklessness in starting the fire under the physical conditions existing, or in a lack of reasonable care to prevent the fire getting beyond control. In other words, that the real reason why liability was imposed was that if defendants saw fit to make use of a dangerous element they were bound to be careful to keep it from harming other people. They argue that there is nothing which has been actually decided in-

consistent with a construction of the acts of Anne and George which will relieve every one from liability for the consequences of a fire which he did not intend to start, but which was started as the result of his negligence or that of his servants. In support of this contention, they point to the fact that, while lack of due care has caused countless fires, the cases are few in which so much as an attempt has been made to hold any one liable for their consequences. The fact as stated is undoubted, and has often been commented upon, as in the Notes to First Cooley's Blackstone, 431. It is doubtless true that both courts and juries realize how easily one may be guilty of some act of momentary carelessness which may cause a fire and involve a destruction of other people's property, which even the absolute financial ruin of the negligent one could not make good. They are reluctant to hold him liable unless his carelessness and the consequences are both clear. Even then they have sometimes sought to restrain the extent of his liability by laying down some rather artificial limitations as to the damages which they will consider the proximate consequences of his negligence. Ryan v. New York Central R. Co., 35 N. Y. 210, 91 Am. Dec. 49; Pennsylvania R. R. Co. v. Kerr, 62 Pa. 353, 1 Am. Rep. 431. But in so doing the Supreme Court and the weight of authority in other states hold that a mistake was made. Milwaukee Ry. Co. v. Kellogg, 94 U. S. 474, 24 L. Ed. 256. The courts have sometimes been asked to make the distinction contended for by the defendants, but they have always refused to do so. Vaughn v. Menrose, 3 Bingham, N. S. 468; Norris v. Holt-Morgan Mills, 154 N. C. 474, 70 S. E. 912.

There can be no question that the damage done to the ships and their cargoes was the proximate and indeed, under the circumstances, the necessary result of the fire in the elevator. The ships were at its side by the invitation of the Elevator Company, and for its profit as well as theirs. It knew that any fire which started in such a structure was likely to spread with a rapidity that injury to vessels made fast to the pier was the not improbable result, if a fire within the building once got headway.

The question remains as to whether the probability of a fire being caused by the friction between a choked belt and its pulley was great enough to make the Elevator Company, because of its failure to use the ordinary means of preventing such friction, liable to the libelants for the consequences of the fire. This question raises an issue of fact, in a common-law case for a jury, and in this for the admiralty judge. In passing upon it, all the facts and circumstances must be taken into consideration. Blackstone construed the statutes of Anne and George as he did because he thought the one on whose premises the fire started suffered enough by the damage done his own property, without requiring him to make good that which the fire caused his neighbors. It is difficult logically to reconcile this reasoning with accepted legal principles, but it has a good deal of human nature in it. Every one who is called upon to pass upon such an issue as that now presented is likely, consciously or unconsciously, to feel a strong sympathy with it, none the less that the claim will often be made, not for

the person whose property has been burned, but by the underwriters who have compensated him for it, and who, if anybody had thought of asking them to do so, would doubtless for a very small premium having insured against any possible consequences of defendants' lack of care. Nevertheless, I cannot help feeling that in this case the negligence of the Elevator Company in the respect discussed was palpable, and that the consequences to which it in fact led were those which might reasonably have been anticipated from it, and doubtless would have been had it so happened that the Elevator Company's officers had ever given thought to the subject. I doubt if they ever did; but, while it is easily understandable how it was that they did not, nevertheless legally they should, and, as they did not, their company must bear the loss.

[3] But is the Pennsylvania also liable? All the stock of the Elevator Company belongs to the Northern Central. It is true a few shares stand in the names of the gentlemen who are directors of the Elevator Company, but they have no beneficial interest in them. When dividends are declared, they are not paid on these shares, or, if paid, are turned over to the Northern Central by the nominal recipients. Some years before the fire, the Northern Central leased all its property and franchises to the Pennsylvania for the term of 999 years. The lease fixes the rent at a sum sufficient to pay on the stock of the Northern Central an 8 per cent. dividend, clear of all taxes and expenses. The latter retains its corporate organization, but does not manage or operate anything.

If any other than the Elevator Company is answerable for the consequences of this fire, it must be because that other actually took such part in the management and control of the elevator as to make itself liable for the negligence of the persons there employed. No rule of law forbade the Northern Central so leasing its property to another as to free itself from any liability for negligent operation by that other. On the other hand, the lessee will be liable if it does anything which would have made the lessor liable had there been no lease. It would be answerable, not because it was the lessee, but because it took such part in the conduct of the business as to make itself liable therefor. Liability does not depend on title. If it exists at all, it is because the person sought to be held actually does something in so negligent a manner that the plaintiff suffers. The fact that the legal title to the fee in the elevator and the land upon which it stood remained in the Northern Central has nothing to do with the case.

What part did the Pennsylvania take in the management of the elevator? It could have done whatever it wished. Any stockholder of a corporation who owns all, or even a majority, of its stock, can absolutely control its policy and management, so long as he acts in good faith towards the minority stockholders, if there are any. He can select its officers, and through them its employés. That the Pennsylvania did. Its general superintendent in Baltimore had been for years the president of the Elevator Company, and, when the individual who had filled those places surrendered one of them, he gave up both, and had the same successor in both. The treasurer of the Elevator

Company was a Pennsylvania employé. It had, however, its own superintendent, who held no office under the Pennsylvania. He had the right of "hiring and firing," as the current phrase puts it, all its subordinate employés. The superintendent and the secretary of the Elevator Company are the only executive officers it pays. Its by-laws provide for the appointment of an assistant secretary, comptroller, sub-comptroller, and various accounting officers. The holders of these posts, except the assistant treasurer, hold similar positions in the Pennsylvania. They were not paid by the Elevator Company. For seven or eight years before the fire the jurisdiction of the comptroller's department of the Northern Central had extended over the accounts of the Elevator Company. A clerk in the comptroller's office of the Northern Central was authorized to sign vouchers of the Elevator Company as its auditor of disbursements. Entries in the minutes of the Elevator Company show that various officers of the Pennsylvania, without first consulting the directors of the Elevator Company, issued orders as to what the latter company should do, and that those orders were obeyed. As for example, in the year 1908, in order to augment its storage facilities, it, under the direction of Freight Traffic Manager Dixon of the Pennsylvania, hired barges at an expense of $16,000.

In February, 1910, the traffic department of the Baltimore & Ohio and the Northern Central decided to abolish the scaleage reduction feature in the elevators at Baltimore, whereupon the respective managements of the elevators were instructed to notify the Baltimore Chamber of Commerce that no such deductions would be thereafter made. In March, 1910, the president reported that he had received authority from the fourth vice president of the Pennsylvania to increase the salary of the Elevator Company's superintendent to $375 a month.

In June, 1912, the president of the Elevator Company reported that, with the approval of Vice President Dixon of the Pennsylvania, he had entered into an arrangement with the Chamber of Commerce, under which the Elevator Company would undertake to maintain in concrete tanks not less than 30 per cent. in monetary valuation of the grain stored at Canton.

In June, 1914, the president of the Elevator Company reported that the traffic department of the Pennsylvania had effected an arrangement by which the Elevator Company would insure the grain stored at the Canton elevators at the rate of 25 cents per $100 per annum, and suggested that the superintendent of the Elevator Company be sent to Philadelphia to consult with the superintendent of the Pennsylvania insurance department with a view to perfecting the details.

In October, 1914, it was reported that the operation of the Pennsylvania under the lease of the Northern Central had resulted in transferring all persons employed therein to the service of the Pennsylvania, whereupon the Elevator Company released the Northern Central from the previously existing pension agreement.

After the fire now in controversy, an inquiry was made as to whether the Pennsylvania would guarantee the insurance on the grain destroyed by fire, and the Pennsylvania notified the Chamber of Commerce it

would do so. The fire loss was adjusted by the insurance department of the Pennsylvania. The price list upon which claims were settled was sent to the Pennsylvania insurance department for their approval.

Sometimes, though not always, when the Elevator Company had surplus cash, it was turned over to the Northern Central, not as a dividend, but as a special deposit at 3 per cent., and then in January, 1908, when this deposit amounted to $100,000, the Elevator Company voted that the rent it had paid for two of its elevators for six years had been $14,000 per annum too low, and for three years $2,200 on the other, and that the Northern Central might take $90,600 of the money on deposit for this back rent. A year later the president of the Elevator Company reported that under a decision of the Northern Central it would have to pay $14,000 a year insurance.

Still, on the other hand, the organization of the Elevator Company was regularly kept up. Its stockholders' meetings were held, its directors met monthly. At the time of the fire, it had a considerable surplus of upwards of $200,000 in bank. It was in no sense a mere shell. At the same time, it was true that everybody connected with it knew that the Pennsylvania owned it and that anything the Pennsylvania chose to say was final. The officers and directors of the company could not always keep in memory the fact that, while the Pennsylvania could do what it would by its control over the stock, that control ought regularly to be exercised only through the board of directors of the Elevator Company. At times, the Pennsylvania was allowed to do things in a way which was not quite consistent with the assumption that the Elevator Company was an independent corporation; but there was no such wiping out of the corporate organization as is described in the case of Goralski et al. v. General Stevedoring Co. (D. C.) 213 Fed. 51.

In this case we are not dealing with an act in itself a wrong to some one else, done by the direction of the governing body of the Elevator Company. If we were, it might well be argued that the Pennsylvania, controlling all the stock of the Elevator Company and directing so many of its actions, ought not to be heard to say that it had not directed a particular one. That issue does not arise in this case and need not be here passed upon.

The libelants are justified in asserting that the elevator was operated as a facility to the business of the railroad company. They say that the owner of the stock of a subsidiary corporation, which is doing a part of its work, or which exists to facilitate the carrying on of its business, is answerable for its defaults in some cases in which one who owned its stock merely as an investment would not be. It does not seem necessary here to go into the merits of this contention. It would hardly seem that the stockholder thereby necessarily waives all its rights to rely upon the limitations of its liability in every case in which some servant of the subsidiary company does some careless thing to another's hurt. We are not here dealing with a subsidiary corporation without substantial resources, and which exists merely as a shield to enable the owner of its stock to carry on his business without exposing himself to liability for the negligence of the employés

who are required to run that business. The Elevator Company had considerable resources of its own. They were ordinarily adequate fully to protect any one likely to be injured by the negligence of its employés.

The libelants rely on Lehigh Valley R. Co. v. Dupont, 128 Fed. 840, 64 C. C. A. 478, and Lehigh Valley R. Co. v. Delachesa, 145 Fed. 617, 76 C. C. A. 307.

The Lehigh Valley Railroad Company owned all the stock of the Easton & Amboy Railroad Company. The same men held the same offices in each of the two corporations. The Lehigh Valley absolutely controlled everything that the Easton & Amboy did. Each of the companies had a separate account book. In every other respect they were carried on precisely as if the Lehigh Valley had owned and operated the railroad lines of both corporations. In the first case, the person injured was a passenger; in the second, a stevedore. The United States Circuit Court of Appeals for the Second Circuit held the Lehigh Valley Railroad Company liable, and said:

"Where the lines of several railroad corporations are conducted as a single system, for the purposes of the traffic between different points, originating upon either, the corporations may constitute themselves a partnership for the business of such traffic; and when they do, although the general management of each road is retained by the corporation owning it, the several corporations are, as to such business, partners, and liable upon the principles of the law of agency."

It does not seem to me that the facts here proved bring the case within the rule there laid down. The rule of respondeat superior is based on practical considerations, rather than on fundamental justice. It is not clear that it is always right to hold every one who gets a profit out of a particular business to unlimited liability for every negligent act of every one of the servants employed therein. As the law is, one not protected by a statute is liable for the acts of one who is technically his servant, when such acts are committed in the course of his business. The lawmaking power recognizes that this rule, useful as it is in most cases, may sometimes work great injustice, as is instanced in the limited liability statutes for the protection of shipowners. The negligence which resulted in damage to the libelants was negligence of people who were not legally the servants of the Pennsylvania. This case presents no facts which require that the legal form shall be ignored in order that justice may be done.

It follows that as against the Pennsylvania the libel will be dismissed, with costs. The Elevator Company will be held liable to the libelants for the damage suffered by them as a result of the fire. The amount can be ascertained by agreement or by a reference or by a hearing in open court.