PHOSPHATE MINING CO. v. UNIONE AUSTRIACA DI NAVIGAZIONE GIA AUSTRO-AMERICANA & FRATELLI COSULICH SOCIETA ANONIMA.

(Circuit Court of Appeals, Second Circuit. November 3, 1924.)

No. 1.

Shipping ⬥⟹56—Owner not liable for charterer's breach of contract to subcharterer.

Though a partnership which entered into contract on its own behalf for ocean carriage of cargo for libelant by steamer to be named, owned no vessels, and was accustomed to charter vessels from respondent to carry out such contracts, and though the partners owned 20 per cent. of the stock of respondent, the corporation was not liable for partnership's breach of charter party by failure to furnish vessel.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Phosphate Mining Company against the Unione Austriaca di Navigazione Gia Austro-Americana & Fratelli Cosulich Societa Anonima. Decree for libelant and respondent appeals. Reversed.

Haight, Smith, Griffin & Deming, of New York City (Clarence B. Smith, of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Roscoe H. Hupper and Carl G. Stearns, both of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The appellant is an Austrian corporation and the appellee is a New York corporation. On July 17, 1913, at London, England, the appellee and Fratelli Cosulich executed a charter party in writing, wherein it was agreed that Fratelli Cosulich would carry a cargo of phosphate from Tampa, Fla., to Barcelona, Spain. The charter provided for the chartering "of the good steamships * * * to be named 14 days before readiness to load, but in any case not later than 14 days prior to canceling date in each case." It provided for shipment of 2,500 tons during 1914; 2,500 tons during 1915, and "loading dates were to be declared by the charterer two months prior to the commencement of lay days on each lot." In November, 1914, the appellee gave notice by cable, which was received in November, 1914, declaring that May 1 to June 11, 1915, were to be the loading dates for the shipment of 2,500 tons of this phosphate to Barcelona, pursuant to the charter.

It is charged that the appellant failed to furnish a steamer to the appellee between these dates, and, on the contrary, gave notice on November 17, 1914, and again on March 29, 1915, that it would not do so, because of the then existing state of war in which Austria was a belligerent nation. Fratelli Cosulich is a partnership, and both it and the appellant are separate entities, but it does appear that the words "Fratelli Cosulich" appear as part of the title of the appellant corporation. Members of the Cosulich family are directors of the appellant and owned 20 per cent. of the stock. Oscar Cosulich testified that he was a stockholder of the appellant, and that the charter was entered into by Fratelli Cosulich for and on their own behalf, and not as agents of or on behalf of the Unione Austriaca Di Navigazione and no contract ever existed between Fratelli Cosulich and Unione Austriaca Di Navigazione with regard to the charter party mentioned. He testified that he prepared the copartnership papers and the documents necessary for the organization and the registration of the appellant. He was familiar with its affairs. He declared it was organized under the laws of Austria, with its principal place of business in Trieste, and that it and Fratelli Cosulich were separate and entirely independent legal and business entities, and he said that a relationship did exist between the two, because partners of the firm Fratelli Cosulich happened to be directors of the appellant; that Fratelli Cosulich has always been accustomed in the past, as they are now, to enter into contracts of charter for the ocean carriage of phosphate cargoes. He further testified that it had been the practice of Fratelli Cosulich to arrange with the appellant for the transportation of ocean

cargoes by them, and said that there was no contract or agreement compelling the partnership to turn over to the corporation contracts of charter and/or affreightment entered into by them. He was emphatic in declaring that in the instant case the charter party was entered into in the sole interest of the partnership, and not as agents or on behalf of the appellant. The partnership did not own any vessels in 1915, and it was then their practice to charter vessels of the appellant, and carry out their own contracts of affreightment. The partnership's agents in London, Tyson & Co., negotiated the present charter and carried on the negotiations in its behalf. The first cargo load of 2,500 pounds was carried before the war broke out under a bill of lading dated July 6, 1914, containing the following cause:

"(1) The acts of God, public enemies, the restraint of rulers, princes and people, pirates, robbers and arrests, fire on land and sea, and every danger and accident of the sea, river, machinery, boilers and navigation, of what ever nature or kind mutually excepted, barratry of master and crew, strandings, collision, and all loss and damage caused thereby also excepted."

It was not until November 14, 1914, after the war started, and Great Britain and her allies had established a blockade against Germany, Austria, and the other central powers, that the appellee cabled Fratelli Cosulich that it wished the second cargo carried between May 1st and June 11th. In the same months the appellant replied that on account of the war, it would be unable to carry the cargo, but it would carry it if the war should cease. On March 8, 1915, the appellee again sent a notification, requesting that the second shipment to Barcelona be carried between May 1 and June 11, 1915, and on March 29th, the appellant replied by cablegram that the cablegram of November 4, 1914, "never reached us, and presume has been stopped on the way," and advised the appellee that the war would prevent the shipment of the 1915 cargo. There is proof in the record that it was not possible or feasible, after Italy entered the war on May 15, 1915, to send letters from Trieste to the United States, and that "letters were stopped at some neutral or allied place." Oscar Cosulich testified that the chartering of vessels for oceanic trade was impossible, because no foreign owner would risk going against the Enemy Act published by Great Britain. He pointed out that Austrian laws also prohibited communication with enemies, and that postal and telegraphic communications between Austria and her enemies were interrupted and prohibited, and that the censorship instituted by the belligerent powers stopped all communications which would have been sent through "dummy firms" from neutral places.

It is clear to us that the charter party was not made by the appellant, nor by any agent on its behalf. Fratelli Cosulich was an independent partnership, which took contracts similar to the one here sued upon, and carried them out through subcharterers. This method of carrying on its business was the policy of the partnership and the corporation was not otherwise interested. From the testimony it appears to have been of long standing. Even though the subcharter was made upon the same terms, it did not constitute any contractual relations between the appellee and the appellant. This appellant was never a party to the charter in suit. Its obligation must be measured by the contract between it and the partnership. In no way did it become obligated to the appellee.

The case of Luckenbach Steamship Company, Inc., v. W. R. Grace Co., Inc. (C. C. A.) 267 F. 676, is distinguishable. There a corporation owned a number of ships and leased them to another corporation, which had a small capital stock, and which was controlled by the same officers and directors. The rental was far below the value of the ships and it was held that the owning corporation was so far interested in the contracts of the leasing corporation as to be liable for their breach. It was pointed out that there was sufficient to warrant the conclusion that Edgar F. Luckenbach owned 94 per cent. of the stock of the steamship company and 90 per cent. of the leasing company. This caused the companies to be regarded as one and the same. These facts warranted a strong presumption of Luckenbach's identity with that of the corporation's, so as to warrant the conclusion that the steamship company was liable for the breach of contract. In the case at bar, the stock ownership in the appellant by members of Fratelli Cosulich is but 20 per cent. No motive is shown for the identity of the two enterprises, for their business has been carried on separately and independently. It cannot be said that the potential and the ultimate control of the property and business affairs of the appellant is lodged in the partnership, nor that the control was exercised so completely and directly as the machinery of the corporate organism would permit. There was no complete dominance and control by the partnership which made

the appellant its mere instrumentality (U. S. v. D. L. & W. R. Co., 238 U. S. 516, 35 S. Ct. 873, 59 L. Ed. 1438; Lehigh Valley R. R. v. Du Pont, 128 F. 840, 64 C. C. A. 478); but, on the contrary, we deem our decision in The Banes, 221 F. 416, 137 C. C. A. 214, to be controlling.

Reaching this conclusion, we deem it unnecessary to consider the further defense that the appellant is excused by reason of the provision as to the restraint of princes.

Judgment reversed.