DILLARD & COFFIN CO. *v.* RICHMOND COTTON OIL
CO. *et al.**

*(Jackson.* April Term, 1918.)

1. **CORPORATIONS.** Debts of dummy. Liability of dominating
corporation.

Missouri corporation organized for convenience of Tennessee cor-
poration which was to finance it, *held merely* dummy of Tenn-
essee corporation, so that Tennessee corporation was liable to
complainants for balance due on money advanced to Missouri
corporation and used by it in its business under principle that
equity will disregard legal entity of one corporation when
controlled by another. (*Post, pp.* 292-296.)

Cases cited and approved: Towles & Co. v. Miles, 131 Tenn., 79;
McDonald, Shea & Co. v. Railroad, 93 Tenn., 281; Madison Trust
Co. v. Stahlman, 134 Tenn., 402.

2. **CORPORATIONS.** Debts of dummy. Liability of dominating cor-
poration.

A corporation which for purpose of determining whether it
would purchase properties of another took over all properties
under agreement whereby it was to operate in name of latter,
pay all operating expenses and six per cent. rental, and retain
all moneys due and payable to the latter, *held*, regardless of
validity of agreement, liable to complainants who, during ex-
istence of agreement, advanced to latter's dummy money used
by dummy to pay operating expenses. (*Post, pp.* 296-298.)

3. **CORPORATIONS.** Stock transaction. Validity.

An agreement by which one corporation for purpose of determin-
ing whether it would purchase properties of another took over
all properities of latter was to operate in latter's name, pay oper-
ating expenses, and retain all moneys due and payable to latter,
was not a "stock transaction," and was valid where not made
for purpose of stifling competition. (*Post, pp.* 298-300.)

*On power of one corporation to deal in the stock of other cor-
poration, see note in 18 L. R. A. 252.

As to how far a private corporation is estopped from raising
defense of *ultra vires* in an action brought against it, see note in
L. R. A. 1917A, 749.

Cases cited and approved: Coal Creek Coal Co. v. Tenn. Coal Co., 106 Tenn., 651; Starke v. Guffey, 98 Tex. 582.

4. **CORPORATIONS.** "Stock transaction." Validity.

One corporation cannot purchase stock of another. (*Post, pp.* 300-303.)

5. **CORPORATIONS.** Ultra vires contracts. Estoppel.

A corporation which has received and retains money in the operation of its business under a void contract will not be heard to say that its acts are *ultra vires.* (*Post, pp.* 300-303.)

Cases cited and approved: Elevator Co. v. M. & C. R. R., 85 Tenn., 703; Marble Co. v. Harvey, 92 Tenn., 115; Miller v. Insurance Co., 92 Tenn., 167; Clark v. Memphis S. & Ry. Co., 123 Tenn., 232; Hotel Co. v. Dyer, 125 Tenn., 302; Wood v. Green, 131 Tenn., 583; Nat. Bank v. Stahlman, 132 Tenn., 367; Central Transit Co. v. Pullman Palace Car Co., 139 U. S., 24; Tenn. Ice Co. v. Raine, 107 Tenn., 151; Rankin v. Emigh, 218 U. S., 27; Citizens' Cent. Nat. Bk. v. Appleton, 216 U. S., 196.

---

FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County —HON. F. H. HEISKELL and ISRAEL H. PERES, Chancellors.

WILSON & ARMSTRONG and ST. JOHN WADDELL, for appellee.

CARUTHERS EWING and W. B. MILLER, for appellants.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

The bill in this case was filed against the Richmond Cotton Oil Company, a Tennessee corporation, the Planters' Gin Company, a Missouri corporation, and

the Buckeye Cotton Oil Company, an Ohio corporation, to recover a balance of account in favor of complainant and carried upon its books against the defendant, the Planters' Gin Company. There was a decree in the court below in favor of complainant against all of the defendants, and the Buckeye Cotton Oil Company has appealed therefrom and assigned numerous errors.

In 1906 the Planters' Gin Company was organized under the following circumstances:

The Richmond Cotton Oil Company owned certain gins in Missouri, which it was expressly authorized to do by its charter. These gins were operated by the Richmond chiefly to procure the seed from the cotton ginned by them in order to promote its business of making cotton oil. H. A. Sugg, on July 20, 1906, made a proposition in writing to the Richmond Company that he would incorporate the Planters' Gin Company under the laws of Missouri, according to a definite charter and by-laws which were prepared before the organization of the Planters' and attached to the proposition for its organization. He proposed that the Planters' would buy the gins of the Richmond Company at a named price, and that the stock of the Planters', when organized and issued, would be hypothecated with the Richmond to secure the purchase price of the gins, and such advancements for the operation of the Planters' after its organization as the Richmond might make to it. He stipulated that the Richmond should give him the option to buy at par any of the stock of the Planters' which the Richmond

might desire to sell, and in case that Mr. Sugg should purchase any of the stock, he agreed to pay interest at seven per cent. on all the money which the Richmond had invested in the stock or in the operation of the company up to the time he bought the stock. He further required the Richmond Company to furnish the necessary capital for operation of the Planters' not to exceed $20,000 during the cotton season. Also that he be given the option to buy at par all of the stock which the Richmond Company had taken over, at any time that he might elect; and in event he decided to exercise the option he agreed to sell to the Richmond, or its successors, all the cotton seed ginned, handled, or controlled by the Planters' in Missouri, at the market price. In addition it was agreed that the Richmond should loan to Mr. Sugg and associates par on any amount of the Planters' stock which they might desire to hypothecate, or to buy at par any time, any amount of such stock as they might desire to sell.

After the organization of the Planters' its stock and stock books were delivered to the Richmond. The Richmond dictated its board of directors and its policies. It had it to adopt a by-law which enabled the Richmond to discharge its board of directors whenever it desired, and to elect new directors in conformity with its wishes. The officers of Planters' made daily reports to the Richmond of each transaction which it had. The general manager of the Richmond understood and so testifies that the business of the Planters' was the business of the Richmond, and it

paid the financial obligations of the Planters' on more than one occasion. The relations between the two corporations was not a secret with the trade. The Richmond conveyed the gins situated in Missouri to the Planters' without the payment of any other consideration than the delivery to it of the stock of the Planters'. It financed the operations.

We think there can be no doubt but what, as between the two corporations, the properties held by the Planters' were the properties of the Richmond. The organization of the Planters' was a mere convenience or possibly a device of the Richmond for the furtherance of its business activities. The proposition made by Sugg to the Richmond before the organization of the Planters' involved no personal liability upon the part of Sugg, or the receipt of any substantial consideration by the Richmond for the properties which it was proposed to convey to the Planters'. In equity the situation as between the Richmond and the Planters' was as though the Planters' had not been organized. If the Planters' should earn sufficient profits to pay for the stock which Mr. Sugg might desire to buy, the ownership of the properties conveyed to the Planters' might finally pass to the Planters'; but if, at any time, Mr. Sugg should demand of the Richmond that it buy back the stock which he held, the agreement referred to required that company to do so. If Mr. Sugg should desire to buy stock the agreement required the Richmond to advance to Sugg par value for the stock. It also re-

quired the Richmond to finance the operations of the Planters'. This is what it did before the organization of the Planters.

It is said in defense that this transaction was illegal and *ultra vires* the powers of the Richmond. However this may be, we do not consider it important to decide. The fact remains that the Planters' was completely dominated and controlled by the Richmond. It was so understood both by the Richmond and by the Planters'. They intimate the promoter's agreement between the Richmond and Sugg necessarily involves the control and operation of the Planters' when organized by the Richmond. It is well-settled law in this State that when such a state of facts exist, the dominating corporation is liable for the debts of its dummy. *Towles & Co.* v. *Miles,* 131 Tenn., 79, 173 S. W., 439; *McDonald, Chea & Co.* v. *Railroad,* 93 Tenn., 281, 24 S. W., 252; *Madison Trust Co.* v. *Stahlman,* 134 Tenn., 402, 183 S. W., 1012.

The account sued on was created by the Planters' Gin Company drawing drafts on complainant against certain bales of cotton which it had shipped to them for sale. The drafts, which were paid, aggregated more than the total market value of the cotton when sold. There is no suggestion that the money received from complainants in the name of the Planters' was not used in the operation of its business. The Richmond expressly agreed to finance the Planters' in its operations, and, aside from the legal proposition involved, the Richmond would be bound upon its agree-

ment. The manager of the Richmond expressly testifies that the business of the Planters' was the business of the Richmond, and that he so assured the complainants.

If Mr. Sugg were still managing the gins in Missouri for the Richmond, and had incurred the accounts sued upon, in the manner in which it was incurred, there could be no reasonable doubt of the liability of the Richmond for moneys so advanced. The only thing that is supposed to make a defense between the case stated and the case at hand is the supervention of the legal entity of the Planters'. This entity is a fiction of law merely, and when it is controlled and dominated by another corporation, courts of equity disregard the fiction of law and decree according to the merits of the case. So we hold that the Richmond Cotton Oil Company is liable to complainant for its debts.

The next consideration is the liability of the Buckeye Cotton Oil Company. It appears that in 1911 negotiations were pending between the Richmond Company and the Buckeye Company for a sale of all the properties of the Richmond to the Buckeye. It was agreed between the two companies that the Buckeye Company would operate the Richmond for a period of three years, but in order to preserve the good will of the Richmond, in the event the operations ceased at the end of three years, it was agreed between them that all of the business of the Richmond should be done in its name. Accordingly the Rich-

mond turned over to the Buckeye all of the cotton oil mills, gins, and the like, and every other kind of property which it possessed, and made such arrangements with the banks with which it was doing business at the time as would insure the full control and disposal of all funds which it had to the Buckeye Company. Instead of actually conveying its property to the Buckeye Company by lease or otherwise, it gave the control thereof to the latter company by allowing the entity to dominate and control the corporate organization of the Richmond Company. This domination and control was complete, unless it could be said that the employment by the Buckeye Company of the general manager of the Richmond Company prevented it from being so. Mr. Sloan, who had been the manager of the Richmond Company, for whom the negotiations with the Buckeye Company were conducted, was retained by the Buckeye Cotton Oil Company as general manager, and he was apparently still the general manager of the Richmond Company. Complainants did not know that the Buckeye Company was in control of the Richmond Company, and they had, prior to the present transaction, known Mr. Sloan as the manager of the Richmond Company, and supposed that he still was. Nominally, this supposition was true, but in fact his salary was paid by the Buckeye Company and he was responsible to it.

It was during this domination of the Richmond by the Buckeye that the account sued upon arose. When complainants realized that the drafts drawn in the

name of the Planters' Gin Company might exceed the value of the cotton consigned to them, they went to Mr. Sloan about the matter. He assured them that the business of the Planters' Company was the business of the Richmond Company, and that the Richmond Company would pay any balance it might be due them finally on account of the drafts. At that time Mr. Sloan was the manager of the Richmond for the Buckeye Company under the agreement between it and the Richmond. This agreement provided that the Buckeye Company should pay all expenses of operating the Richmond Company, and should have all the moneys due to and receivable by it.

The defense of the Buckeye Company is, in effect, that the relationship between it and the Richmond Company was illegal and void.

In view of the argument of learned counsel, it is necessary to state what this transaction is not. It is not a stock transaction. It may be preliminary to a stock transaction, but upon the undisputed evidence it was intended as a means of enabling the Buckeye Company to ascertain the earning capacity of the Richmond Company, thereby enabling it to determine whether it would buy the properties of the Richmond Company. It paid a rental which was agreed to be six per cent. upon the valuation of the properties. The stockholders of the Richmond received these earnings upon their stock, and the stockholders of the Buckeye received the gross earnings of the Richmond, and agreed to pay its operating expenses.

Dillard & Coffin Co. v. Cotton Oil Co.

Now, if the Richmond Company had been operating the gins in law instead of having elected the organization of the Planters' Company to operate them for it, it could not be doubted that the expense of operating these gins would be a part of the operating expenses of the Richmond which the Buckeye had agreed to pay. Without regard to the regularity of such agreement between the Buckeye and the Richmond, the Buckeye would be bound as between it and the complainant, whose money it had received and expended in the operation of the Richmond.

If the Buckeye Company had acquired control of the Richmond for the purpose of stifling competition, or for any other unlawful purpose, it is doubtless true that the contract between them would be void, but it is undisputed in this case that the operation of the Richmond by the Buckeye was experimental only, and for the specific purpose of enabling the Buckeye to determine the value of the properties of the Richmond. We cannot see that such an arrangement is unlawful. No reason is suggested why business men should not be allowed to form their judgment of the value of properties of this kind in which the element of margin is a large per cent. of their value when they have no illegal or immoral purpose in view. The arrangement was for the short period of three years. The asset of good will of the Richmond was a valuable one to it, and the plan adopted to preserve this asset to the Richmond was well calculated to serve that end.

If this were a formal lease there could be no doubt of the regularity of the transaction. *Coal Creek Coal Co.* v. *Tenn. Coal Co.*, 106 Tenn., 651, 62 S. W., 162; *Starke* v. *Guffey*, 98 Tex., 582, 86 S. W., 1, 4 Ann. Cas., 1057, and note. But under such an arrangement the good will of the Richmond Company would have been dissipated. The only difference between the arrangement made and a formal lease was that the business of the Richmond was transacted in its name and its good will thus preserved. In equity such transactions were with the Buckeye, although in outward form they were in the name of the Richmond. So we think that in fact the money advanced by complainants to the Planters' Gin Company was used in the operation of the business of the Buckeye Company. This being true, it is immaterial whether the arrangement between it and the Richmond was legal or illegal. The thing was done by the Buckeye and it received the money of complainants, which was used in the operation of its business in the form which it chose to operate it, and we see no reason in equity why it should not return that which it has received.

Learned counsel for the Buckeye Company has dealt with the case as though it were a stock transaction. It is insisted that the Buckeye can only be held liable through the legal entities of the Planters' and the Richmond. It is insisted that the Richmond had no right to dominate the Planters', and that the Buckeye had no right to dominate the Richmond, and

therefore when complainant advanced money to be used in the operation of the business of the Planters' he was without remedy. There can be no doubt at this day of the inability of one corporation to buy the stock of another. *Elevator Co.* v. *M. & C. R. R.,* 85 Tenn., 703, 5 S. W., 52, 4 Am. St. Rep., 798; *Marble Co.* v. *Harvey,* 92 Tenn., 115, 20 S. W., 427, 18 L. R. A., 252, 36 Am. St. Rep., 71; *Miller* v. *Insurance Co.,* 92 Tenn., 167, 21 S. W., 39, 20 L. R. A., 765; *Clark* v. *Memphis St. Ry. Co.,* 123 Tenn., 232, 130 S. W., 751; *Hotel Co.* v. *Dyer,* 125 Tenn., 302, 142 S. W., 1117; *Wood* v. *Green,* 131 Tenn., 583, 175 S. W., 1139; Nat. *Bank* v. *Stahlman,* 132 Tenn., 367, 178 S. W., 942; *Central Transit Co.* v. *Pullman Palace Car Co.,* 139 U. S., 24, 11 Sup. Ct., 478, 35 L. Ed., 55. And that any proceeding based upon an assumption of an *ultra vires* contract cannot prevail. But it is equally well settled in this State and elsewhere that a corporation that has received and retains money in the operation of its business under a void contract will not be heard to say that its act was *ultra vires* in order to defeat an action to recover back its money. *Tenn. Ice Co.* v. *Raine,* 107 Tenn., 151, 64 S. W., 29; *Rankin* v. *Emigh,* 218 U. S., 27, 30 Sup. Ct., 672, 54 L. Ed., 915; *Citizens' Cent. Nat. Bk.* v. *Appleton,* 216 U. S., 196, 30 Sup. Ct., 364, 54 L. Ed., 443. A discussion of this entire subject will be found in the Monographic in L. R. A. (N. S.), 1917A, p. 749, appended to *Gilbert* v. *Citizens' National Bank,* p. 740.

It is useless for us to examine the cases cited in the elaborate note for the purpose of determining what the weight of authority may be. We consider the question settled, so far as this court is concerned, in *Ice Co.* v. *Raines,* supra. In that case the cases were reviewed, and it is said that it was immaterial whether it be considered that the *ultra vires* contract is void when an implied contract arises by law, or whether it be considered that the corporation is estopped to plead *ultra vires.* There are authorities each way, but the court is committed to the proposition that if a corporation receives a thing of value by virtue of a contract *ultra vires,* it must restore that which it has received.

We think what has been said sufficiently answers the contentions made by the defendant, and we need not pursue them any longer. We think the Planters' Gin Company was organized by the Richmond Company for its own business convenience, and its separate legal identity can be disregarded when the ends of justice require it. In this view, the money sued for was advanced to the Richmond Company. By the arrangement between the Buckeye Company and the Richmond Company the Buckeye Company agreed to pay the operating expenses of the Richmond Company, and the money sued for was properly an operating expense of the Richmond Company. Each one of the corporations was expressly authorized by its charter to buy and sell cotton. The transaction had with complainants was clearly within the corporate

Dillard & Coffin Co. v. Cotton Oil Co.

powers of each. The thing urged as debarring complainant's right to recover is really a lack of privity between complainant and the Buckeye Company, and this absence of privity is thought by counsel to exist because of the legal identity of the Planters' Company and the Richmond Company. From the authorities cited, we hold that this is not tenable.

The decree of the chancellor will be affirmed.