## THE WILLEM VAN DRIEL, SR.

### NAAM LOOZE VENNOOT SCHAP, S. S. WILLEM VAN DRIEL, SR., v. PENNSYLVANIA R. CO. et al.

(Circuit Court of Appeals, Fourth Circuit. May 1, 1918.)

No. 1552.

1. NEGLIGENCE ⟺25—OPERATION OF GRAIN ELEVATORS—DEFECTIVE MACHINERY—FIRES.

The burning of a grain elevator, causing damage to vessels loading thereat, *held* due to negligence of the elevator company in not having proper equipment for notifying operator to stop drive wheel or conveyer belt, resulting in the fire from friction.

2. NEGLIGENCE ⟺134(11)—OPERATION OF GRAIN ELEVATOR—CAUSE OF FIRE—EVIDENCE.

Evidence *held* to sustain finding of trial court that elevator fire, causing damage to property in the vicinity, arose from heat generated from friction owing to the choking of a belt used in operating the elevator.

3. RAILROADS ⟺259(3)—FIRES—PERSONS LIABLE—LESSEE OF ELEVATOR—CONTROL.

Where a railroad company owned all the stock of an elevator company, except a few shares necessary to qualify the latter's officers, and leased the elevator to another railroad company for 999 years, the latter assuming liability for damages, the lessee is liable for the loss to vessels by fire communicated on account of negligence in the operation of the elevator.

Cross-Appeals from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Libel by the Naam Looze Vennoot Schap, S. S. Willem Van Driel, Sr., a corporation, owner of the steamship Willem Van Driel, Sr., against the Pennsylvania Railroad Company and the Central Elevator Company of Baltimore City. Judgment for libelant against the Central Elevator Company only (242 Fed. 285), and the libelant appeals, with cross-appeal by the Elevator Company. Decree affirmed as to liability of the Elevator Company, and reversed as to liability of the Railroad Company.

Albert C. Ritchie, of Baltimore, Md., and J. Parker Kirlin, of New York City (John M. Woolsey and Charles R. Hickox, both of New York City, Stuart S. Janney, of Baltimore, Md., and Robert W. Williams, of Washington, D. C., on the brief), for appellant and cross-appellee.

Shirley Carter, of Baltimore, Md. (Bernard Carter & Sons, of Baltimore, Md., on the brief), for appellees and cross-appellant.

⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before KNAPP and WOODS, Circuit Judges, and CONNOR, District Judge

WOODS, Circuit Judge. Grain elevator No. 3, with the capacity of about 1,000,000 bushels, was located on a wharf in the Canton district of the port of Baltimore. On June 13, 1916, the ship Welbeck Hall, on its east side, and the ship Willem Van Driel, on its west side, were loading grain. About 2 o'clock in the afternoon, after a large part of the cargo of each ship had been loaded, a great explosion occurred in the elevator, which was immediately followed by a fire. Both ships were seriously injured and a number of persons killed. .

On the 22d of January, 1917, a libel was filed on behalf of the ship Willem Van Driel and its owner against the elevator company and the Pennsylvania Railroad Company alleging: (1) Damages from the fire to the ship and cargo in the aggregate sum of $379,142.25; (2) negligence in the operation of the elevator which caused the fire; (3) liability of the elevator company, and also of the Pennsylvania Railroad Company, as the real owner and operator of the elevator, for the damages, and for such sums as the ship is liable for to the owners of tugs for salvage services rendered at the time of the fire.

After taking a great mass of testimony the District Court found these facts on the question of negligence: The long belts, to which are attached buckets conveying the grain, are liable to become choked; the consequent stopping of a belt while the pulley to which it is attached continues to move causes friction, which will soon break the belt and produce great heat. Unless the friction is promptly relieved by stopping the pulley, the heat may be so great as to cause ignition. Due care to prevent fire required that some means should be provided to stop quickly the revolving pulley in the upper part of the elevator, upon discovery of the choke by the operatives at the foot of the leg through which the belt moved. Originally, the means adopted in this elevator was a rope attached to the pulley, by which the operatives on the lower floor could detach the pulley and stop the conveying belt as soon as it became choked. This instrumentality was abandoned, and reliance placed on communications to the operatives on the upper floors by speaking tubes. To connect with the machinery floor on which the pulleys were placed, such messages had to be relayed from the next floor below. The machinery room above was 240 feet long; and the only regular attendant on that floor was an oiler, whose duties sometimes required him to be absent, attending to duties elsewhere. Owing to his absence on this occasion, the tube message was not received by him on the machinery floor, and there was delay of about 2 minutes in getting the information to the machinery floor, by a messenger sent from the floor below. The message that No. 3 belt was choked was understood by Aires, a mill expert on the machinery floor, to refer to No. 2 belt. This mistake caused a further delay. Aires called through a hole in the floor to Smith, the operator who had sent the message, that No. 2 was all right. Upon being informed that the trouble was with No. 3 Aires, with Lucas, the messenger, moved the lever intended to disconnect the pulley controlling the belt, but with-

out effect. Looking into No. 3, he saw smoke. Afterwards a scantling was used in the unsuccessful effort to stop the large wheel which drove the pulley. Aires then walked about 120 feet to a telephone, where he could communicate with the engineer, and ordered all the machinery stopped. This order was promptly obeyed, but it was about 2½ minutes after the power was shut off before the machinery stopped. Immediately thereafter No. 3 belt broke and fell. The engine was then started again on the supposition that all danger was over. Very soon afterwards the fire and explosion occurred.

[1] From this condensed statement of the facts, considered in the light of ordinary knowledge of physical law, it is evident that friction produced by a choked belt was liable to make heat sufficient to ignite explosive dust, always present in an elevator, and the dry wooden structures through which the belt ran. It seems equally clear that in the presence of such a peril mechanical means should have been provided to stop the running of the pulley against a choked belt, if such mechanical means could be provided at reasonable expense, and that, if excessive expense or other causes prevented the use of such mechanical device, a speaking tube or telephone communication should have been provided from the operative at the foot of the belt to an operative at the pulley to send and receive the warning to stop the pulley. The failure to provide either of these means of prompt and certain communication justifies the finding by the District Court of lack of due care in providing against fire.

[2] Strong argument is presented in support of the contention that the fire originated in leg No. 2, and was not due to the choking of the belt in No. 3. While there is some confusion and conflict in the evidence, careful consideration leads to the conclusion that the finding of the District Court that it did originate in No. 3 from the negligence in operation is too well supported by the evidence for this court to disturb it. There was indubitable testimony that smoke was seen in No. 3 and that live coals fell from it after the choking and the friction. It is true that some of the witnesses testified to the presence of live coals about the same time in leg No. 2. If there were no evidence of an operating force sufficient to cause fire, and of the actual presence of smoke and sparks at that location before the fire, it would hardly be safe to say that the preponderance of the evidence indicated the origin of the fire in No. 3. What fixes the preponderance against No. 3 as the place of origin is the presence of a force operating there sufficient to cause fire, and the absence of such force in leg No. 2. The finding of the District Court that the fire originated in No. 3, because of the lack of reasonable care in providing an arrangement to disconnect promptly the pulley from a choking belt, is so well supported by the evidence that it would be improper for this court to disturb it.

[3] The inquiry remains whether the Pennsylvania Railroad is liable as a participant in the operation of the elevators by reason of its control of the elevator company. This depends upon the question of fact whether the elevator company, although in name and organization a distinct corporation, was in substance a mere corporate agent or instrumentality of the Pennsylvania Railroad Company. So. Pac.

Terminal Co. v. Int. Comm. Com'n, 219 U. S. 523, 31 Sup. Ct. 279, 55 L. Ed. 310; Joseph R. Foard Co. v. State of Maryland, 219 Fed. 827, 135 C. C. A. 497; Lehigh Valley R. Co. v. Delachesa, 145 Fed. 617, 76 C. C. A. 307.

There is no controversy as to the material facts of the relationship between the Pennsylvania Railroad Company and the elevator company. The Northern Central Railroad Company constructed elevator No. 3 in 1903. The Central Elevator Company was incorporated in 1901, with capital stock of $100,000. Its entire stock was subscribed by the Northern Central Railroad Company and is now so held, except a few shares bestowed to qualify individuals as directors. The dividends on all the stock of the elevator company were paid to the Northern Central Railroad Company. In 1914 the Northern Central Railroad Company leased all of its property and franchises to the Pennsylvania Railroad Company for 999 years. This lease, while formally executed in 1914, provided by its terms that it should be effective from the 1st day of January, 1911, and the control of the Pennsylvania Railroad Company over the Northern Central and the elevator company commenced certainly not later than that date. The lease provides for the payment of 8 per cent. dividends by the Pennsylvania Company on the stock of the Northern Central. The latter company retained its organization for the purpose of distributing the dividends, but after 1911 did not manage or operate anything. By the terms of the lease the Pennsylvania Railroad Company assumed to the Central Railroad Company liability for all claims for damages. After 1911 the Pennsylvania Company maintained the same relationship to the elevator company that the Northern Central had maintained before. The elevator company could accept no grain except that which came over the tracks of the controlling railroad. The general superintendent of the Pennsylvania Company in Baltimore, as an incident of that office, is president of the elevator company. The treasurer, the assistant secretary, comptroller, subcomptroller, and other accounting officers, holding similar positions in the railroad company, have charge of the accounts of the elevator company, but are paid by the railroad company. An employé of the railroad company signs the vouchers of the elevator company as its auditor of disbursements. The railroad company, through various officers, issued orders from time to time as to the charges and other features of the management of the elevator company. The salary of the superintendent of the elevator company was increased by order of the fourth vice president of the railroad company. The railroad company controls the funds of the elevator company. In January, 1908, when the surplus of the elevator company amounted to $100,000, held by the Northern Central Railroad Company on a special deposit at 3 per cent., the elevator company, at the request of the railroad company, voted to apply $90,600 of this surplus as additional rent for preceding years.

It is true that the elevator company and its stockholders and directors held meetings, but in all essential particulars their action was dictated and controlled by the railroad company. The whole course of dealing showed that the surplus of $200,000 it had in the bank at the time of

the fire was absolutely under the control of the railroad company. The superintendent of the elevator company, who directed its mechanical operation and its subordinate employés, had no duty to perform with the railroad company, but were evidently under its ultimate control. It would be impossible to imagine a relationship between corporations where the subsidiary corporation was more completely under the control of the dominant corporation. The elevators were constructed and operated merely as a facility to the business of the railroad company. Applying the language of Judge Wallace in Lehigh Valley Railroad Co. v. Du Pont, 128 Fed. 840, 64 C. C. A. 478, the potential and ultimate control of all its property and business affairs of the elevator company was lodged in the railroad company, and this control was exercised as completely and as directly as the machinery of corporate organisms would permit. Such complete dominance and control by the railroad company made the elevator company its mere puppet. United States v. Del., Lack. & West. R. R., 238 U. S. 516, 35 Sup. Ct. 873, 59 L. Ed. 1438.

The decree of the District Court is affirmed as to the liability of the elevator company, and reversed as to the liability of the Pennsylvania Railroad Company.

