United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 13, 1999 Decided January 21, 2000 

 No. 98-7206

 Transamerica Leasing, Inc., et al., 
 Appellees

 v.

 La Republica de Venezuela and 
 Fondo de Inversiones de Venezuela, 
 Appellants

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 97cv01354)

 Alexander E. Bennett argued the cause for appellants. 
With him on the briefs were Mark H. Stumpf, Steven G. 
Reade, Jean E. Kalicki, and Beth R. Kallet.

 John E. Bradley argued the cause for appellees. With him 
on the brief were Benjamin P. Deutsch, and Lisa M. Cobb. 
Cherie B. Artz entered an appearance.

 Before: Ginsburg, Henderson, and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: Twelve companies that leased 
equipment to the now defunct CompaNia Anonima Venezolana 
de NavegaciOn (CAVN), a shipping company owned by the 
Republic de Venezuela, brought suit against Venezuela and 
the Fondo de Inversiones de Venezuela (FIV), an instrumen-
tality of the Venezuelan government created to assist in 
restructuring and privatizing state enterprises. The first 
three counts of the complaint allege that Venezuela and the 
FIV are derivatively liable for CAVN's breaches of contract. 
The final count alleges that Venezuela and the FIV are 
directly liable for having caused CAVN to breach its con-
tracts with the plaintiffs.

 In this interlocutory appeal, Venezuela and the FIV argue 
that they are immune from suit upon all counts under the 
Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. 
s 1602 et seq., and that they are immune from suit upon the 
fourth count under the "act of state" doctrine as well. We 
hold that because they did not exercise the requisite control 
over CAVN, Venezuela and the FIV are indeed immune from 
suit upon the first three counts. We remand the case for the 
district court to consider in the first instance whether the 
defendants are immune from suit upon the fourth count.

 I. Background

 Although the parties vigorously dispute many details of the 
relationship between CAVN and the defendants, the basic 
facts underlying this case are uncontested. CAVN was an 
international shipping company created in 1917 by Venezuela 
and operated as a state-owned instrumentality until it filed 
for bankruptcy in 1994. At all relevant times, the FIV, 
known under Venezuelan law as an "autonomous institute," 
owned 99.86% of CAVN's stock and Venezuela, through vari-
ous ministries, owned the remainder. The plaintiffs are 
twelve corporations that leased to CAVN shipping equipment, 
such as containers and chassis, between 1982 and 1993.

 In the early 1990s CAVN began experiencing severe finan-
cial trouble, in part because of the inefficient way in which it 
handled leased equipment. In September 1991 the FIV, 
concerned about CAVN's mounting losses, commissioned the 
consulting firm Booz, Allen & Hamilton, Inc. to assess 
CAVN's financial health and operating procedures. Booz 
Allen recommended that CAVN restructure its operations, 
upgrade its fleet, overhaul its handling of leased equipment, 
and in general strengthen its management.

 In 1992 CAVN requested financial assistance from the FIV, 
which referred the request to the Sectoral Cabinet for Eco-
nomic and Social Policy Issues, an organization that by law 
must approve all such requests before the FIV may act. The 
Cabinet approved CAVN's request conditioned upon CAVN's 
agreement to restructure. When CAVN agreed to that con-
dition, the FIV commissioned Booz Allen to prepare a re-
structuring plan. The FIV made funds available to CAVN 
through a trust agreement under which the FIV is both 
settlor and trustee and CAVN is the beneficiary. Under the 
agreement, CAVN had to place some of its assets in trust 
with the FIV as collateral.

 Notwithstanding these efforts, CAVN began to fall behind 
in its lease payments and in 1993 the plaintiffs issued notices 
of default and termination. In November 1993 CAVN and 
the lessors agreed to restructure CAVN's payments; until 
January 1994 the FIV provided additional capital infusions to 
allow CAVN to meet the restructured payment schedules. In 
April 1994 the lessors again agreed to restructure CAVN's 
payments. By July, however, CAVN was unable to continue 
operations: it filed for bankruptcy in October 1994.

 In June 1997 the plaintiffs brought this suit against the 
Republic of Venezuela and the FIV (henceforth referred to 
collectively as "Venezuela" or "the Government"). In the 
first three counts of the complaint they allege that Venezuela 
used CAVN as its "alter ego," or as its "agent," or that it 
cloaked CAVN with apparent authority to bind the Govern-
ment, and that Venezuela is therefore liable upon the lease 
agreements and restructured payment schedules. In the 

final count the lessors allege that Venezuela, by refusing to 
continue providing funds to CAVN, caused CAVN to breach 
its contracts with the plaintiffs. Venezuela moved to dismiss 
the complaint in January 1998, claiming that under the FSIA 
it is immune from suit upon all counts and that suit upon the 
fourth count is precluded under the act of state doctrine as 
well.

 The district court denied Venezuela's motion to dismiss. 
Based upon the pleadings and the extensive evidence submit-
ted supporting and opposing the motion, the district court 
found that Venezuela, which had appointed the Board, exert-
ed extensive control over CAVN's everyday operations, 
played a major role in CAVN's financial restructuring, and 
appeared to have authorized CAVN to act on its behalf. 
From these findings the district court concluded both that 
CAVN had in fact acted as the Government's agent, and that 
it had apparent authority to act for the Government, in its 
dealings with the plaintiffs, and therefore that Venezuela is 
amenable to a suit based upon the activities of CAVN. The 
court did not discuss the final count of the complaint, in which 
the plaintiffs seek to hold Venezuela liable for causing CAVN 
to breach its contracts, and with respect to which the Govern-
ment raises the act of state objection.

 II. Analysis

 Venezuela filed this interlocutory appeal in order to press 
its claim of immunity from suit. Under the FSIA a "foreign 
state [is] immune from the jurisdiction of the courts of the 
United States and of the States," subject to certain enumerat-
ed exceptions. 28 U.S.C. s 1604. For this purpose, "foreign 
state" includes any "agency or instrumentality" thereof. 28 
U.S.C. s 1603(a). Both Venezuela and the FIV are immune 
from suit upon the plaintiffs' claims, therefore, unless those 
claims fall within one of the listed exceptions. The plaintiffs 
contend that their claims are within the "commercial activity" 
exception, which provides that:

 (a) A foreign state shall not be immune from the juris-
 diction of courts of the United States or of the States in 
 any case--
 
 * * *
 
 (2) in which the action is based upon a commercial 
 activity carried on in the United States by the foreign 
 state; or upon an act performed in the United States in 
 connection with a commercial activity of the foreign state 
 elsewhere; or upon an act outside the territory of the 
 United States in connection with a commercial activity of 
 the foreign state elsewhere and that act causes a direct 
 effect in the United States;
 
28 U.S.C. s 1605(a)(2).

 Venezuela implicitly concedes that the first three counts of 
the complaint are based upon "commercial activities" within 
the meaning of 28 U.S.C. s 1605(a)(2), but maintains that it is 
not amenable to a suit based upon the commercial activities of 
CAVN because CAVN was not its agent. As to the final 
count, Venezuela argues first that the activities alleged there 
are not "commercial activities," and second that they are acts 
of state for which the Government is immune from trial in 
any event.

 The district court's denial of a foreign state's motion to 
dismiss upon the ground of sovereign immunity is subject to 
interlocutory appeal under the collateral order doctrine. See 
Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 
F.2d 438, 443 (D.C. Cir. 1990) (citing Cohen v. Beneficial 
Industrial Loan Corp., 337 U.S. 541, 545-47 (1949)). We 
review the district court's findings of fact for clear error, see 
Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 
1020, 1028 (D.C. Cir. 1997), and in this case we find none. 
We review de novo the district court's determination that 
Venezuela is not entitled to immunity, see id., to which task 
the balance of this opinion is devoted.

A. Subject matter jurisdiction, Counts I-III

 A government instrumentality "established as [a] juridical 
entit[y] distinct and independent from [its] sovereign should 
normally be treated as such"; thus, it is presumed to have 
legal status separate from that of the sovereign. First 
National City Bank v. Banco Para El Comercio Exterior de 

Cuba, 462 U.S. 611, 627 (1983) (Bancec). That presumption 
can be overcome in two situations: First, "where a corporate 
entity is so extensively controlled by its owner that a relation-
ship of principal and agent is created," id. at 629 (citing 
NLRB v. Deena Artware, Inc., 361 U.S. 398, 402-404 (1960)); 
and second, where recognition of the instrumentality as an 
entity apart from the state "would work fraud or injustice." 
Id. (citing Taylor v. Standard Gas & Electric Co., 306 U.S. 
307, 322 (1939)). Although the Supreme Court in Bancec 
recognized these as exceptions to the rule that a foreign 
sovereign is not liable for the acts of an instrumentality of the 
state, we have since held that they serve also as exceptions to 
the rule that a foreign sovereign is not amenable to suit based 
upon the acts of such an instrumentality. See, e.g., 
Foremost-McKesson, 905 F.2d at 446-47. Accordingly, the 
present plaintiffs argue both reasons--agency and injustice--
for holding that Venezuela is amenable to suit based upon the 
activities of CAVN.

 1. The agency exception: Principles
 
 Our previous decisions applying the agency exception to the 
rule of sovereign immunity have generally focused upon how 
much control the sovereign exercised over the instrumentali-
ty, without explicating why and the circumstances in which 
control is relevant to the question of the sovereign's amena-
bility to suit. See, e.g., McKesson Corp. v. Islamic Republic 
of Iran, 52 F.3d 346, 352 (1995). Control by the sovereign is 
relevant in two distinct contexts, as discussed below.

 a. Control
 
 First, control is relevant when it significantly exceeds the 
normal supervisory control exercised by any corporate parent 
over its subsidiary and, indeed, amounts to complete domina-
tion of the subsidiary. A sovereign is amenable to suit based 
upon the actions of an instrumentality it dominates because 
the sovereign and the instrumentality are in those circum-
stances not meaningfully distinct entities; they act as one. 
Indeed, in the case cited by the Supreme Court to illustrate 
the agency exception, various corporations were allegedly 

operated as a "single enterprise." See NLRB v. Deena 
Artware, Inc., 361 U.S. 398 (1960).

 In that case, the NLRB had ordered an employer to offer 
reinstatement and backpay to former employees. See id. at 
399. Although the employer initially complied with the order, 
it soon ceased operations without having paid back wages. 
See id. The employer was, however, only one of several 
wholly-owned subsidiaries of the same parent corporation. 
See id. at 399-400. The Board petitioned the court of appeals 
to hold not only the subsidiary employer but also its parent 
and the sister subsidiaries in civil contempt. The Board 
proceeded in part upon the theory that the various corpora-
tions were operated as a "single enterprise" with each per-
forming "a particular function, as a department or division of 
the one enterprise in the manufacture, sale and distribution of 
the common product." Id. at 401. The court of appeals 
dismissed the petition but the Supreme Court reinstated it 
and granted the Board discovery on the "single enterprise" 
issue. Id. at 404.

 In the course of reaching that decision, the Supreme Court 
offered numerous examples of situations where one company 
so dominated another that the courts held the controlling 
company liable for the obligations of the controlled company. 
Thus, if one corporation is "operated as a division of another," 
then the latter may be held responsible for the acts of the 
former. Id. at 403 & n.2 citing, for example, Foard Co. v. 
Maryland, 219 F. 827, 829 (4th Cir. 1914) (involving subsid-
iary that did not handle any funds and paid all profits to 
parent "as a charge for managing the business"), and Dillard 
& Coffin Co. v. Richmond Cotton Oil Co., 140 Tenn. 290, 293-
94 (1918) (involving parent that could at any time dismiss 
subsidiary's Board of Directors and appoint new directors of 
its choosing, that received "daily reports of each transaction" 
consummated by subsidiary, and that paid financial obli-
gations of subsidiary). Or the "affairs of the group may be so 
intermingled that no distinct corporate lines are maintained." 
Id. at 403 & n.4, citing, for example, The Willem Van Driel, 
Sr. v. Pennsylvania R.R. Co., 252 F. 35, 37 (4th Cir. 1918) 
(involving railroad that dictated subsidiary elevator compa-

ny's clients, appointed own officers to run elevator company, 
controlled elevator company's accounts, and used elevator 
company's profits for its own purposes). In addition, a 
parent corporation may be held liable for the acts of a 
subsidiary that is a "shell, inadequately financed." Id. at 403 
& n.3, citing, for example, Luckenbach S.S. Co., Inc. v. W.R. 
Grace & Co. Inc., 267 F. 676, 681 (4th Cir. 1920) (involving 
subsidiary that was undercapitalized, issued 94% of its stock 
to owner of parent, leased equipment from parent at "far 
below ... rental value," and was "personally managed" by 
owner of parent).

 Second, control is relevant when the sovereign exercises its 
control in such a way as to make the instrumentality its 
agent; in that case control renders the sovereign amenable to 
suit under ordinary agency principles. See Gilson v. Repub-
lic of Ireland, 682 F.2d 1022, 1026 n.16, 1029 (D.C. Cir. 1982) 
("An agent's actions may provide the basis for jurisdiction 
over the principal"). The relationship of principal and agent 
depends, however, upon the principal having "the right to 
control the conduct of the agent with respect to matters 
entrusted to [the agent]." Restatement (Second) of Agency 
s 14 (1958).

 A sovereign does not create an agency relationship merely 
by owning a majority of a corporation's stock or by appoint-
ing its Board of Directors. See Foremost-McKesson, 905 
F.2d at 448; Restatement (Second) of Agency s 14M. If 
majority stock ownership and appointment of the directors 
were sufficient, then the presumption of separateness an-
nounced in Bancec would be an illusion. At the same time, a 
sovereign need not exercise complete dominion over an in-
strumentality--to the point of stripping it of any meaningful 
separate identity--in order to establish a relationship of 
principal and agent. If such domination were required, then 
agency principles would be superfluous because, as discussed 
above, the sovereign would be subject to suit on the ground 
that instrumentality and sovereign were in fact a single 
entity.

 Courts have long struggled, often with confusing results, to 
explain how much control is required before parent and 
subsidiary may be deemed principal and agent. Cf. Berkey v. 
Third Avenue Railway Co., 244 N.Y. 84, 155 N.E. 58, 61 
(1926) ("The whole problem of the relation between parent 
and subsidiary corporations is one that is still enveloped in 
the mists of metaphor"); Restatement (Second) of Agency 
s 14M reporter's notes ("When liability is fastened upon the 
parent it is said that the subsidiary is a 'mere agent' [which 
has resulted in] a weakening and muddying of the term 
'agent' and a failure by courts to state the real reasons for 
their decisions"). The question defies resolution by "mechan-
ical formula[e]," for the inquiry is inherently fact-specific. 
See Bancec, 462 U.S. at 633. At a minimum, however, we can 
confidently state that the relationship of principal and agent 
does not obtain unless the parent has manifested its desire 
for the subsidiary to act upon the parent's behalf, the subsid-
iary has consented so to act, the parent has the right to 
exercise control over the subsidiary with respect to matters 
entrusted to the subsidiary, and the parent exercises its 
control in a manner more direct than by voting a majority of 
the stock in the subsidiary or making appointments to the 
subsidiary's Board of Directors. See Restatement (Second) 
of Agency s 1 ("Agency is the fiduciary relation which results 
from the manifestation of consent by one person to another 
that the other shall act on his behalf and subject to his 
control, and consent by the other so to act").

 That a state and a state-owned corporation may in some 
circumstances be, respectively, principal and agent does not 
necessarily mean, however, that in those circumstances the 
sovereign is amenable to a suit based upon the acts of the 
agent. For example, "jurisdiction [over the sovereign] cannot 
be maintained if the agent's actions are not related to the 
substance of plaintiff's cause of action." Gilson, 682 F.2d at 
1029-30. Nor, under principles of agency, is a sovereign 
amenable to suit upon a contract that its agent made on its 
own account though, unbeknownst to the contracting plaintiff, 
the sovereign had authorized the agent to make the contract 

on the sovereign's behalf. See Restatement (Second) of 
Agency s 199.

 b. Apparent authority
 
 A plaintiff might contend that a corporation, even if not an 
agent of the sovereign, had apparent authority to act on the 
sovereign's behalf. In that case the plaintiff would have to 
show that it reasonably relied upon a manifestation by the 
sovereign to that effect. See Restatement (Second) of Agency 
s 27 ("[A]pparent authority to do an act is created as to a 
third person by [a manifestation] of the principal which, 
reasonably interpreted, causes the third person to believe 
that the principal consents to have the act done on his behalf 
by the person purporting to act for him"); see also Restate-
ment (Second) of Agency s 27 cmt. d (explaining that a 
manager "has apparent authority to do those things which 
managers in that business ... customarily do"); Restate-
ment (Second) of Agency s 159 & cmt. b; Restatement 
(Second) of Agency s 8 & cmt. a. For example, if a sover-
eign falsely represented to a third party that an instrumental-
ity of the state was authorized to act as the sovereign's agent 
and the third party reasonably relied upon that representa-
tion when contracting with the instrumentality, then under 
agency principles the third party could sue the sovereign 
upon the contract under a theory of apparent authority even 
though the sovereign and the instrumentality were not, in 
fact, related as principal and agent. See, e.g., Restatement 
(Second) of Agency s 8 cmt. a, illus. 3. We doubt, however, 
that a case of merely apparent authority falls within the 
agency exception--an exception limited by its terms to situa-
tions in which the instrumentality "is so extensively controlled 
by [the sovereign] that a relationship of principal and agent is 
created." Bancec, 462 U.S. at 629. (Still, in an appropriate 
case a court might attribute the acts of the instrumentality to 
the sovereign under the exception for fraud or injustice).

 2. The agency exception: Application
 
 With these background principles in mind, we turn to the 
facts of the case at bar. Recall that the district court denied 
Venezuela immunity under the FSIA based upon its conclu-

sions that CAVN was an agent of the State and that CAVN 
had apparent authority to act for the State. Upon appeal, the 
plaintiffs also seem to argue that Venezuela so dominated 
CAVN as to deprive it of separate juridical identity.

 a. Control
 
 In our view, the plaintiffs, whether understood to contend 
that Venezuela so dominated CAVN that the corporation 
lacked a distinct identity, or merely that CAVN acted as the 
Government's agent, have failed to demonstrate that Vene-
zuela controlled CAVN to a degree sufficient to render the 
State amenable to suit based upon the actions of the corpora-
tion.

 The district court focused upon five facts that led it to 
attribute the actions of CAVN to the Government: Venezuela 
(1) owned a majority of CAVN's stock; (2) appointed the 
Board of Directors and the Chairman of the Board and 
President; (3) was involved in CAVN's "day-to-day" opera-
tions by overseeing the restructuring of CAVN's intermodal 
operations and approving the sale of three of CAVN's vessels; 
and (4) aided CAVN financially by allowing the FIV to enter 
into a trust agreement with CAVN; while (5) the President of 
CAVN, with apparent authority to bind Venezuela, assured 
one of the plaintiffs that the Government would support 
CAVN. Before this court, the plaintiffs press these consider-
ations as support for both their domination and their agency 
theories of the case.

 In our view however, the facts as found, considered as a 
whole, establish neither that Venezuela dominated CAVN nor 
that CAVN was Venezuela's actual or apparent agent. The 
first two facts--that the Government owned CAVN's stock 
and could appoint CAVN's Board of Directors and the Chair-
man and President--are relevant but as a matter of law do 
not by themselves establish the required control, see 
Foremost-McKesson, 905 F.2d at 448, and the remaining 
factors do not make up the shortfall.

 As for the third fact, the Government's purported role in 
CAVN's "day-to-day operations," the district court found that 

"CAVN's Board of Directors appointed Captain Antonio 
Romero Sierraalta, a maritime professional and officer in the 
Venezuelan Navy, with full power and authority, to head a 
new Intermodal Division," and that the Board directed him to 
implement Booz Allen's recommendations for restructuring. 
After describing the extensive changes Capt. Sierraalta made 
in that managerial capacity and noting that " 'the [B]oard of 
[Directors] was aware of [the] details ...' of these efforts," 
the district court concluded that the Government, "through 
the appointment of Capt. Sierraalta, effectively comman-
deered the principal intermodal operations of CAVN." These 
findings, however, describe nothing more than the sole share-
holder exercising its influence, through the Board of Di-
rectors, to put its own chosen manager in charge of a 
corporation that was suffering severe operational problems--
and leaving to him the task of running "day-to-day" opera-
tions. If that were enough to make the shareholder answera-
ble for the acts of the corporation, then the holding of 
Foremost-McKesson that majority stock ownership and con-
trol over the Board of Directors are insufficient to transform 
parent to principal and instrumentality to agent would be 
limited to cases in which the shareholder is utterly quiescent; 
let it exert itself at all to protect its interests and it loses its 
legal identity separate from that of the corporation. That is 
not the law. See, e.g., Restatement (Second) of Agency 
s 14M.

 The court also found that the Government was involved in 
CAVN's "day-to-day" operations because "the Economic De-
partment for the Sector, an agent of ... Venezuela, autho-
rized the sale of [three] of CAVN's vessels." This finding 
adds no support for the proposition that Venezuela exercised 
the requisite control over CAVN. First, the sale of a portion 
of its fleet as part of a massive restructuring hardly qualifies 
as CAVN's "day-to-day" business. Second, it is not uncom-
mon for a government--as regulator, not as shareholder--to 
require approval for certain transactions in the transportation 
sector. See, e.g., 49 U.S.C. s 11323(a)(2)(requiring that the 
Surface Transportation Board approve a "purchase, lease, or 
contract to operate property of another rail carrier"); 46 App. 

U.S.C. s 1704(a) (giving Federal Maritime Commission juris-
diction over certain agreements among "ocean common carri-
ers"). Because the record evidence cited by the district court 
in support of its finding is somewhat cryptic, it is unclear why 
the Department for the Sector approved the sale of the ships 
and even whether its approval was required. There is at 
least some evidence in the record that Venezuela generally 
regulates the sales of vessels. Without more, we cannot say 
that requiring a shipping company to obtain governmental 
approval for the sale of vessels represents the exercise of 
Venezuela's authority as shareholder rather than its exercise 
of governmental power in the ordinary course of regulation.

 Finally, the district court considered the Government's 
"financial involvement" with CAVN. The court found that 
CAVN's counsel, in a letter to the United States Federal 
Maritime Commission, had "acknowledged that the operating 
assets of CAVN were owned and controlled by ... Venezue-
la." In context, however, that statement is utterly innocuous. 
The letter was sent in response to a request from the FMC 
for information, which included the following question:

 Are your operating assets directly or indirectly owned or 
 controlled by a government under whose registry any of 
 your vessels operate? ... For purposes of this ques-
 tion, ownership or control is deemed to exist if a majority 
 interest in the carrier, or its operating assets, is owned 
 or controlled in any manner by a government ... or 
 entity controlled by such government.
 
Counsel answered the question by stating, "Yes, the Republic 
of Venezuela," which he had to do simply because "a majority 
interest in the carrier ... [was] owned by [the] government" 
of that country. As we have seen, however, mere ownership 
does not imply control of the sort that could render the 
Government amenable to suit based upon the acts of the 
corporation.

 Also under the heading of financial involvement, the district 
court found that Venezuela had "decided to inject funds into 
CAVN as part of the restructuring plan" and that the FIV 
had entered into the trust agreement with CAVN so that 

CAVN could "satisfy its debts and attain liquidity." Far 
from demonstrating that Venezuela and the FIV exercised 
the type of control over CAVN that would justify attributing 
the corporation's actions to them, the facts as found reflect 
only a normal relationship between a sovereign and an instru-
mentality of the state. Indeed in Bancec the Court noted 
that a "typical government instrumentality" has primary re-
sponsibility for its own finances "[e]xcept for appropriations 
to provide capital or to cover losses." Bancec, 462 U.S. at 
624. In other words, the infusion of state capital to cover 
CAVN's losses was a normal aspect of the relation between a 
government and a government-owned corporation, not an 
instance of "day-to-day" involvement in the affairs of the 
corporation, and hence does not tend to justify stripping 
Venezuela of its sovereign immunity.

 The other findings marshaled by the district court as 
evidence of the Government's involvement in CAVN's finan-
cial affairs similarly demonstrate only that Venezuela provid-
ed funds to CAVN in order to reorganize the ailing company 
and to bail it out of debt. Taken together, the district court's 
findings do not show that Venezuela controlled CAVN in a 
manner sufficient to forfeit its immunity under the FSIA.

 The plaintiffs direct our attention to still other evidence in 
the record that was not the subject of the district court's 
findings--and all of which the defendants contest--that they 
claim justifies attributing CAVN's actions to Venezuela. We 
will neither rehearse nor resolve these disputes here. View-
ing the disputed facts favorably to the plaintiffs, however, we 
remain unconvinced that Venezuela exercised such control 
over CAVN as to make the Government amenable to suit 
based upon CAVN's actions under the principal and agent 
exception announced in Bancec.

 Our decision in McKesson, contrary to the plaintiffs' argu-
ment, does not indicate a different result. McKesson in-
volved a suit brought by American holders of a minority 
interest in an Iranian dairy against the Government of Iran 
and several instrumentalities thereof. The shareholders al-
leged that Iran had acted through its instrumentalities unlaw-

fully to divest them of their equity in the dairy. See McKes-
son, 52 F.3d at 348. We affirmed both the district court's 
conclusion that the instrumentalities had acted as agents of 
Iran in divesting the plaintiffs of their equity and its holding 
that the acts of the instrumentalities were attributable to 
Iran, which was not, therefore, immune from the suit under 
the FSIA. See id. at 352.

 Although the district court had made extensive findings 
detailing Iran's pervasive control over the instrumentalities, 
we focused upon four facts. First, the instrumentalities 
owned a majority of the dairy's stock and controlled six of the 
seven seats on its Board of Directors. See id. at 351. 
Second, the Government of Iran had issued anti-American 
policy statements to the instrumentalities, which they reason-
ably believed the Government wanted them to carry out in 
their dealings with the dairy's American shareholders. For 
example, the Managing Director of one of the instrumentali-
ties, who eventually chaired the dairy's Board of Directors, 
stated that the dairy "was no longer a 'joint stock company' 
whose primary fiduciary duty was to its stockholders" and 
declared it the dairy's "main objective ... to protect the 
interests of the country." Id. at 351. Third, Iran directly 
controlled "[r]outine business decisions, such as declaring and 
paying dividends to shareholders and honoring the dairy's 
contractual commitments"; indeed, the dairy's Board of Di-
rectors had "deferred [their] decision to withhold dividends 
from [one of the American shareholders]" until they had 
received approval from "Iran's Cabinet Ministers (and offi-
cials answerable to them)." Id. at 351-52. Finally, we 
emphasized that the dairy had not "simply carr[ied] out a 
state commercial policy as a normal part of the corporation's 
mission, without any state involvement" but instead had acted 
to effectuate a governmental policy "designed to injure some 
of the corporation's own shareholders ... through a corpo-
rate policy guided by government representatives." Id. at 
352.

 Beyond the features inherent in a state-owned corporation, 
namely the government's ownership of stock and control of 
the Board of Directors, this case bears no resemblance to 
McKesson. Venezuela did not evince an intent to have 

CAVN act as its agent in dealing with the plaintiffs. No one 
at CAVN sought the Government's approval for routine busi-
ness decisions. In short, McKesson is to this case what the 
Chicago Manual of Style was to e.e. cummings: not control-
ling.

 b. Apparent authority
 
 The district court next considered whether Venezuela had 
indicated to the plaintiffs that CAVN could act as its agent, 
that is, whether Venezuela had apparently given CAVN au-
thority to act for it. Upon appeal the plaintiffs also pursue 
this theory in support of the district court's holding.

 In reaching the conclusion that CAVN had apparent au-
thority to bind the Government, the court found that Vice 
Admiral Efraim Diaz TarazOn of the Venezuelan Navy, who 
also served for a time as President and Chairman of the 
Board of CAVN, had assured one of the plaintiffs--while 
wearing his naval uniform, no less--that "Venezuela would 
support CAVN." This finding, which is the only support for 
the district court's conclusion that Venezuela had cloaked 
CAVN with apparent authority, is insufficient to render the 
State liable for the acts of the corporation. Appointing 
TarazOn as President of CAVN certainly cloaked him with 
authority to bind CAVN, see Restatement (Second) of Agen-
cy s 27 cmt. d, above, but something more would be required 
before a creditor of CAVN could reasonably infer that Tara-
zOn was thereby authorized to bind the Government. Tara-
zOn's decision to dress as an Admiral when he met with one of 
the lessors is just that--TarazOn's sartorial decision--not an 
indication coming from the Government that it had authorized 
him to commit government funds outside the normal channels 
running through the Cabinet and the FIV. In the absence of 
any evidence of such an authorization from the Government, 
we reject the plaintiffs' argument that CAVN had apparent 
authority to bind Venezuela.

 3. The exception for fraud or injustice
 
 We turn now to the exception for fraud or injustice recog-
nized in Bancec. 462 U.S. at 629. Although the district court 

did not address it, the plaintiffs argue in passing that this 
exception, too, applies to this case. Their theory, in a nut-
shell, is that the "[d]efendants' failure to adequately provide 
CAVN with the financial resources and the basic tools neces-
sary to run a commercial shipping line and to perform its 
contracts with and commitments to" the plaintiffs "provides 
an independent basis to attribute CAVN's commercial activi-
ties to the [d]efendants for FSIA purposes." The plaintiffs 
cite two cases for support, but neither is of any help to them.

 In Anderson v. Abbott, 321 U.S. 349 (1944), the Supreme 
Court dealt with a suit against some of the shareholders of a 
bank holding company, 321 U.S. at 354, the only substantial 
asset of which was stock in its subsidiary banks. Id. at 358. 
By statute, stock in the banks carried "double liability," 
meaning that both the banks and their shareholders were 
liable to the depositors. Id. at 358-59. The Court held the 
shareholders of the holding company liable for the depositors' 
claims against the subsidiary banks because allowing the 
holding company to insulate them "would allow stockholders 
of banks to retain all of the benefits of ownership without the 
double liability which Congress had prescribed." Id. at 358.

 Here, in contrast to Abbott, the sovereign shareholder of 
CAVN did not use the corporation to defeat any statutory 
policy of either Venezuela or the United States. Nor was 
CAVN, unlike the holding company in Abbott, thinly capital-
ized from its inception--a fact relevant to the fraud or 
injustice exception later given separate recognition in Bancec. 
These two critical differences render Abbott inapplicable to 
the case at bar.

 In Hystro Products, Inc. v. MNP Corporation, 18 F.3d 
1384 (7th Cir. 1994), the plaintiff brought suit under state law 
against the parent of a corporation that had not paid it for 
certain goods before ceasing operations. See id. at 1386-87. 
The jury, finding that the subsidiary was the "alter-ego" of 
the parent, awarded damages to the plaintiff. Id. The court 
of appeals affirmed on the grounds that a reasonable jury 
could have concluded both that the parent and its subsidiary 
had not maintained their "separate identities," see id. at 1390, 

and that the parent "allowed [its subsidiary] to continue to 
place orders knowing that it would 'stiff' [the plaintiff] on the 
final bill." Id. at 1392.

 Hystro Products is inapplicable to the present case for two 
reasons. First, while the parent in Hystro Products dominat-
ed its subsidiary, the plaintiffs here, as we have seen, have 
not shown that Venezuela dominated CAVN. Second, in 
Hystro Products there was evidence that the parent had 
planned for months to shut down its subsidiary and had 
neither told the plaintiff of those plans nor otherwise indicat-
ed that the subsidiary was having financial difficulty. The 
jury therefore reasonably could have concluded that the 
parent had used its subsidiary unjustly to obtain goods for 
which it had no intention of paying. Here, Venezuela did not 
manipulate CAVN in order to obtain a financial benefit from 
the plaintiffs before CAVN went bankrupt; it simply failed in 
the end to bail CAVN out. The Government's extensive but 
ultimately unsuccessful efforts to save CAVN from bankrupt-
cy are a far cry from the fraud involved in Hystro Products.

 We therefore hold that Venezuela is not amenable to suit 
upon the first three counts of the plaintiffs' complaint under 
the fraud or injustice exception. Those counts are dismissed.

B. Subject matter jurisdiction, Count IV

 In the final count of the complaint the plaintiffs allege that 
Venezuela caused CAVN to breach its contracts with them by 
"failing to restore CAVN's accumulated deficits and by refus-
ing to allow CAVN to fully perform its obligations under the 
Equipment Lease Agreements and the restructuring and 
repayment plans." Venezuela contends both that the FSIA 
and the act of state doctrine protect it from suit upon this 
count. The district court did not address either assertion.

 In light of our dismissal of the first three counts of the 
complaint, and of the district court's failure to discuss the 
final count, we leave to the district court in the first instance 
the question whether Venezuela and the FIV are, by reason 
of the FSIA, immune from suit upon the final count. We do 
not reach Venezuela's act of state defense because it is not 

properly subject to interlocutory appeal. See Walter Fuller 
Aircraft Sales, Inc. v. Republic of the Philippines, 965 F.2d 
1375, 1387 (5th Cir. 1992). The act of state doctrine is a 
substantive rule of law that precludes the district court from 
inquiring into the legality of a sovereign's public acts; it is 
not strictly an immunity from suit. See id.

 Although Venezula has asked this court to exercise 
pendent jurisdiction over the act of state issue, we decline to 
do so. We exercise such jurisdiction "sparingly" and not so 
as to "reach[ ] an issue that might be mooted or altered by 
subsequent district court proceedings." Gilda Marx, Inc. v. 
Wildwood Exercise, Inc., 85 F.3d 675, 678, 679 (D.C. Cir. 
1996). Because the district court is yet to determine whether 
Venezuela is immune from suit upon count four pursuant to 
the FSIA, we will not rush in to resolve the act of state issue 
at this juncture.

 III. Conclusion

 For the forgoing reasons, the first three counts of the 
complaint are dismissed. We remand this matter to the 
district court to consider whether the defendants are immune 
under the FSIA from suit upon the fourth count of the 
complaint, and if not, then to take up Venezuela's act of state 
defense.

 It is so ordered.